12718

VERONEE v. CHARLESTON CONSOL. RY. & LIGHTING CO.

(149 S. E., 753)

*Mr. G. L. B. Rivers,* for appellant,

*Messrs. W. Turner Logan* and *James Allen,* for respondent,

August 13, 1929.

The opinion of the Court was delivered by MR. ACTING JUSTICE C. T. GRAYDON.

A trial of the issues in this case was had before his Honor, Judge Townsend, and a jury. The action was one in tort for alleged injuries suffered by the plaintiff, while employed as

a workman with the defendant company. A verdict was rendered in favor of the plaintiff for the sum of $35,000, the total amount asked for in the complaint.

The plaintiff, John H. Veronee, was employed as a machinist by the defendant in a power house in the city of Charleston. The plaintiff was injured when he came in contact with an appliance known as "bus bars," which consists of three copper wires or bars carrying a high voltage of electric current to a machine in the power house known as a "larry." The larry is an appliance used to carry coal from the bunkers and dump it into the fire boxes of the boilers. It is operated very much on the same principle as the street car, except that the street car is operated by a grounded current from overhead wires through the rails, and the larry is run by a current which passes through three "bus bars," which are located over the south rail. The current passes from the "bus bars" to the motor and back to the "bus bars," and at no time is there any current passing through the rails, which merely constitute the track on which the larry runs. The "bus bars" are located over the south rail, about 9½ feet from the north rail.

On the date in question Veronee, the plaintiff, and one Reeves, the chief machinist, went up to the larry, which is situated about 40 or 50 feet from the first floor of the power house, to place a new key for one which was loose on the northeast wheel, which wheel runs on the north rail, about 9 feet from the "bus bars." Veronee assisted in making the key, and went up to place the key in the wheel, requesting that the current be cut off. He was told by Reeves, however, that it was unnecessary to cut the current off. Veronee testified that, while he and Reeves were straddling the north rail, Reeves told him to go to the south side of the larry and see if the bearing on the southeast wheel was hot from binding, and to look at the motor gears, which were located between the rails. He testified that before he was injured he had never been in the upper part of the building, where

the "bus bars" were located, except once, to wit, on September 15, two days before the accident. He further testified that he had heard a man named Fitzgerald being warned about standing on the "bus bars" two days before, when the current was cut off to allow Veronee and others to work on the south side of the larry. Reeves denied that he told Veronee to go to the south side of the larry. He stated, further, that he first knew of Veronee's injury through a noise which attracted his attention on the south side of the larry.

Veronee was severely and painfully burned by reason of the accident, and lost his little finger and the metacarpal bone of his left hand. He was unconscious for several hours after the accident, and received several other burns about his body, in addition to the one which destroyed his finger and the bone of his left hand. For several days after the accident his tongue was mangled and bruised, his lip was blistered, and he had a cut about his chin on which he had been knocked with a hammer to separate him from the "bus bars." As a result of this he had to be fed by a nurse. He was 35 days in the hospital, and returned for an operation on his hand, and remained confined in the hospital about 8 days at this later time. The above facts are detailed for the reason that both the liability of the defendant and the amount of damages awarded are contested.

There are 22 exceptions, but the appellant has grouped them into eight distinct points, which will be considered in the order outlined by appellant.

Exceptions 1 and 22 allege that the Court committed reversible error in allowing the jurors to sit in the case, over defendant's objection, when they were not registered electors, as required by Article 5, § 22, of the Constitution of 1895, in that they had, admittedly, not reregistered in 1928. It is further admitted that all were registered when drawn in December, 1927.

The part of this section which is pertinent to this issue is as follows: *"Qualifications of Jurors. Each juror must be a*

qualified elector under the provisions of this Constitution, between the ages of twenty-one and sixty-five years and of good moral character."

Article 2, § 8, provides: "The General Assembly shall provide by law for the registration of all qualified electors. * * * " Further on in the same section there is a proviso that at the first registration under this Constitution, and until the 1st of January, 1898, the registration shall be conducted by a board of three discreet persons in each county providing for their appointment.

Article 2, § 4, provided, among other things, as qualifications for suffrage, "registration, which shall provide for the enrollment of every elector once in ten years, and also an enrollment during each and every year of every elector not previously registered under the provisions of this article."

Volume 3 of the Code of 1922, § 211, provides: "An enrollment of persons, not previously registered, and entitled to registration, shall be made annually by the board of registration until the year nineteen hundred and eight, when an enrollment of all electors shall be made, and thereafter there shall be the same annual enrollment of electors and the same general enrollment of electors every tenth year, as above provided."

It is evident from the above provisions of the Constitution and statute law that a new regstration is required every tenth year, but nowhere in the Constitution or in the statute is provision made for the time of the year at which this registration shall take place. All of these sections must be construed together, to give proper force to each, and only under a strained construction could it be held that it was necessary for every elector in the State to re-register on the 1st day of January of the tenth year in order to perform jury duty, provided he was otherwise qualified.

The Code provides, in Section 548, subdivision 2 of the Code of Civil Procedure of 1922, Vol. 1, that the County Auditor, Treasurer, and Clerk of Court of Common Pleas

*shall* in the month of December of each year prepare a list of qualified electors in accordance with the provisions of the Constitution to serve as jurors. It would be impossible for this section of the code to be complied with under appellant's contention, and the jury box prepared, if re-registration was necessary on the first day every tenth year before one was qualified for jury duty. If this were the case, no Courts could be held during the months of January, February, and March of every tenth year, and there would be a constant confusion as to the drawing of juries and the administration of justice throughout the entire State. The correct view with reference to this matter is that the elector has the right to re-register at any time during the tenth year, and is eligible for jury duty, provided otherwise qualified. Any other construction than this would deprive the elector between January 1, 1928, and the time at which he could re-register, of his right of citizenship and the Courts of qualified jurors.

The law does not deal in impossibilities, and the construction which appellant would have placed upon the constitutional and statutory provisions would make it an absolute impossibility to try any case during the spring of every tenth year, and would eliminate from service jurors drawn in accordance with the mandate of the law. The act directing the selection of the jury in December of each year is mandatory, and when construed with the sections of the Constitution and the other acts applicable to the jury system forms no basis for a real conflict. Jurors drawn from the box of qualified electors in December of each year are registered electors, who are entitled to serve during the following year, provided, however, there is no disqualfication in other respects. This exception is, therefore, overruled.

Exceptions 2, 3, 4, 5, 6, 7, 9, 16, 17, 18, and 19 allege error on the part of the circuit Judge in refusing to grant a nonsuit or directed verdict in the

cause. The doctrine in South Carolina is well settled that a person before assuming a risk, must not only know, but appreciate the danger in question. *Barnhill v. Cherokee Manufacturing Co.,* 112 S. C., 541, 100 S. E., 151. A careful examination of the facts and circumstances surrounding this case shows to the Court that there was no error in the refusal to grant a nonsuit or directed verdict. There was ample evidence that the place was dangerous, and that Veronee was ordered into this place of danger by a superior, without either knowledge or realization of this danger. *Bize v. V.-C. Co.,* 96 S. C., 425, 81 S. E., 10; *Green v. Sou. Ry.,* 72 S. C., 398, 52 S. E., 45; *Cannon v. Lockhart Mills,* 101 S. C., 59, 85 S. E., 233; *Bunch v. American Cigar Co.,* 126 S. C., 324, 119 S. E., 828; *Harwell v. Columbia Mills,* 112 S. C., 177, 98 S. E., 324. See dissenting opinion of Mr. Justice Cothran in *Bradford v. Woolworth Co.,* 141 S. C., 453, 140 S. E., 105, where the rule is clearly stated as to the duty of the master to furnish to the servant a safe place to work.

The eighth exception imputes error because the circuit Judge permitted the plaintiff, Veronee, to testify concerning a certain offer in compromise. This developed on the cross-examination of the plaintiff. Defendant's counsel was attempting to show that the defendant had offered Veronee his position after the accident. During this line of examination, Veronee told also about an offer of $1,500 accompanying the tender of the position. The circuit Judge immediately ordered the jury to disregard this matter.

In the re-direct, however, it will be noted that the same matter was gone into without objection. It would be dangerous to hold that it would constitute a ground for reversal, upon such statements being elicited by counsel for the party offering the compromise. In this case it is evident that the matter appeared as a result of an effort on the part of the defendant's counsel to show that the damages were less than claimed by the plaintiff, and that the defendant's attitude was fair to the plaintiff. If this Court

lays down the rule that such testimony as this requires a reversal of the cause in every instance, the effort might be made to introduce such testimony in order to force a new trial. If the effort is made by the party who was offered the compromise, in order to show some liability on the part of the defendant, it is clearly erroneous. It should also be excluded on proper motion in any event, by either party, for the reason that the law favors compromise, and will allow neither party to be prejudiced by an offer. But if the offer of compromise is brought out in testimony by the defendant, and the Judge promptly rules the same out, with proper instructions to the jury, such conduct should not cause a new trial, nor the withdrawal of the case from the jury.

Exception 10 alleges error on the part of the Judge in refusing to charge a certain proposition of law in the exact words which appellant handed the request up. This request is based on the language used by Justice Woods in the case of *Stephens v. Railway,* 82 S. C., 549, 64 S. E., 601, 604, in which Mr. Justice Woods uses the words "for in doing so he would be guilty of contributory negligence." Judge Townsend in charging this request changed the word "for" to "if." We think that this was proper, for the reason that it left to the jury the question of the negligence of the plaintiff, and whether or not that negligence was contributory negligence. A person may stupidly obey an order of a superior, and still be not guilty of contributory negligence, for that particular act may not be the proximate cause of the injury. There is still another reason why this exception cannot be sustained. The verdict was for the full amount asked, and the complaint asked for both actual and punitive damages. The jury evidently gave punitive damages, and thereby found that the defendant was also guilty of willfulness, which finding as a matter of law eliminates the defense of contributory negligence. This exception is therefore overruled.

The next group of exceptions, numbered 11 to 15, complain of error on the part of the circuit Judge in charging the jury that the plaintiff assumed the risks

which he knew, or should have known of, unless he was an employee of a street railway corporation, in which event the doctrine of assumption of risk would not apply to the case. Under Article 9, § 15, of the Constitution of 1895, the defense of assumption of risk is not available against employees of a railroad corporation, and this provision is extended in Volume 3, Code of 1922, § 5038, to include also employees of street railways.

In the case of *Becker v. Coast Line,* 128 S. C., 138, 121 S. E., 476, this Court has held that an employee of a railroad repair shop would be entitled to the benefit of this section. It is admitted that Veronee worked in a power house which furnished the power for a street railway system, and that at the instant time he was working on appliances which acually fed the boilers generating this power. The circuit Judge merely left it to the jury to determine whether or not Veronee was an employee who was entitled to the benefit of the section above referred to. We think that this was proper under the circumstances; if anything, it was more favorable to appellant than appellant was entitled to under the law. This exception is therefore overruled.

Exception 20 complains of error because a juror, Arthur R. West, showed prejudice and bias throughout the case. We find no substantiation in the record for this exception. The proper motion for appellant's counsel to make in instances of manifest bias, or prejudice on the part of the juror would have been a motion for a mistrial at the time, as one cannot speculate upon the verdict after discovering a cause for mistrial. The circuit Judge, who was present in the atmosphere of the case, could have easily decided whether or not appellant was entitled to a mistrial. Nowhere in the record is there evidence of any objection by appellant's counsel with regard to the conduct of West. There is an old proverb that "one cannot have the cake and eat it, too," and if appellant's counsel desired to avail himself of the right to question the actions of the juror West, he

should have stated so in open court, and made an exception thereon. He possibly took the other horn of the dilemma, and decided that he would go through with the case and risk the juror West knowing that he showed prejudice. He lost in this selection, and there is no basis for sustaining this exception.

Exception 21 complains that the amount of the verdict is so excessive and out of proportion to the injury as to be obviously the result of unbridled prejudice and passion, and should therefore be set aside. This question was fully discussed by the Court in the recent case of *Duncan v. Record Publishing Company,* 145 S. C., 196, 143 S. E., 31 and the principles therein announced are clearly stated and conclusive with regard to the question here raised. The circuit Judge in both the *Duncan case* and the case at bar heard the evidence and refused a new trial. In both cases the facts were disputed, and the full amount asked for was given by the jury. The injuries to the respondent were severe, serious, and permanent. In addition to actual damages, punitive damages were included in the verdict. This exception is therefore overruled.

All exceptions are overruled, and the judgment is affirmed.

MESSRS. JUSTICES BLEASE, STABLER and CARTER concur.

MR. JUSTICE COTHRAN (dissenting) : While I agree in the main with the disposition by Mr. Justice Graydon of the various exceptions in this case, I do not deem it necessary to discuss any other point in the appeal than the tenth exception. I think that the defendant was clearly entitled to a charge of his second request, as it was presented, and that its modification was reversible error.

The request was this : "I charge you that the plaintiff cannot stupidly, recklessly, or even carelessly obey an order of a superior, requiring him to do an obviously dangerous act, and if plaintiff knows, or as a reasonably prudent man should have known, the act which he was ordered to do was dangerous, he cannot hold the defendant responsible for a

resulting injury, for in doing the act plaintiff would be guilty of contributory negligence." The modification consisted in striking out the word "for," and inserting in lieu thereof the word "if"; thus entirely changing the proposition advanced by the defendant, from one *of law*, into the submission of that issue as one *of fact* to the jury, completely denaturing it, and depriving the defendant of a right which I think it unquestionably had.

The plaintiff strongly contended that Reeves was his superior officer, and had ordered him to leave the north side of the larry, where he was perfectly safe, some 8 or 10 feet from the deadly "bus bars," and go to the south side, where he came in contact with the current. There is no question but that he knew of the activity of the current and of its danger, for he himself testified that he asked Reeves to cut it off as they started up to repair the larry. It was of vital importance, therefore, to the defendant, to show that the place to which he claims Reeves ordered him was dangerous, and known so to be by the plaintiff; if so, the defendant was entitled to the charge requested, based upon this state of facts hypothetically presented.

The request was manifestly taken, word for word, from the opinion of this Court in the case of *Stephens v. R. Co.,* 82 S. C., 542, 64 S. E., 601, 603, by Mr. Justice Woods. In that case the plaintiff was injured while jumping from a moving engine at the direction of the engineer, upon a mission personal to the engineer. The question was considered, regardless of the question whether under the circumstances the engineer in giving the order was acting within the scope of his occupational authority; and, assuming that he was, the question was considered in reference to the obedience by the servant of an order involving an act of obvious peril. The Court said: "The rule that the fireman shall obey the engineer is manifestly limited by the other rule that the fireman shall refuse to obey an order which exposes him to known danger."

The necessary inference is that, if he obeys such an order, he has no cause of action against the master as a matter of law, not an issue for the jury. The Court further said: "The true meaning of the rule is that the employee must refuse to obey orders known to him to be dangerous beyond the peril to be regarded reasonably incident to his employment." A similar inference is justifiable from this declaration. Then to put the matter beyond all question as one of law, and not of fact, for submission to the jury, the Court said: "But, aside from the company's rules of caution above mentioned, the plaintiff could not stupidly, recklessly, or even carelessly obey an order of the engineer requiring him to do an obviously dangerous act, and hold the defendant responsible for a resulting injury; *for in doing so he would be guilty of contributory negligence.*"

Beyond the express authority for the proposition contained in the *Stephens case*, many others may be cited justifying it. In *Lyon v. Railroad Co.*, 84 S. C., 364, 66 S. E., 282, 285, the following charge was approved: "Was the order of such an obviously dangerous character, the execution of which involved such a plain and obvious danger as that a man of ordinary prudence and caution would not have attempted to execute it, would have refused to execute it, would have told the conductor that he could not execute it, and would not have attempted to execute it at all? Now, if the order was of that character, gentlemen, if it involved that obvious danger, and the plaintiff went on, nevertheless, and attempted to carry it out, and from the standpoint of a man of reasonable caution and prudence you would say he was careless in doing it, that he should not have done it, then he would not have been entitled to seek or claim the protection of the order as against his carrying it out in a negligent manner."

In *Lowe v. Railroad Co.*, 85 S. C., 363, 67 S. E., 460, 464, 137 Am. St. Rep., 904, the Court said: "* * * But the servant cannot recklessly * * * obey an order of

his superior requiring him to do an obviously dangerous act."

In *McBrayer v. Co.,* 89 S. C., 387, 71 S. E., 980, 981, the Court said: "In *Stephens v. Railway,* 82 S. C., 549, 64 S. E., 604, the rule as to when a servant will be guilty of contributory negligence in obeying an order of the master is thus stated: 'To show contributory negligence, it is not sufficient that the employee receiving the order should have misgivings, and believe the act required to be hazardous, unless the danger is so imminent and obvious that a man of ordinary prudence would not incur it'."

In numerous cases it has been held that, if the injured servant had the choice of two ways to perform a duty, one entirely safe and the other obviously and greatly dangerous, and adopted the dangerous way whereby he was injured, he, as a matter of law, *not of fact,* would be guilty of contributory negligence which would bar a recovery. *Hunter v. Alderman,* 89 S. C., 502, 71 S. E., 1082; *Lyon v. Railroad Co.,* 84 S. C., 364, 66 S. E., 282; *Lowe v. Railroad Co.,* 85 S. C., 363, 67 S. E., 460, 137 Am. St. Rep., 904; *Dover v. Lockhart,* 86 S. C., 229, 68 S. E., 525; *Lewis v. Gallivan,* 87 S. C., 210, 69 S. E., 212. If the present case had been one involving this principle, would it not have been error to charge that under these circumstances it was a matter for the jury to say whether the conditions constituted contributory negligence or not, when a request in conformity with this principle had been preferred?

In *Pinckney v. Railroad* Co., 92 S. C., 528, 75 S. E., 964, 977, the Court said: "Disobedience of rules by a servant which combined with the negligence of the master proximately causes him injury, will generally be held by the courts to be contributory negligence as a matter of law." If the present case had been one involving this principle, would it not have been error to charge that under these circumstances it was a matter for the jury to say whether the conditions constituted contributory negligence or not, when

a request in conformity with this principle had been preferred?

Again, it has been held that, where the complaint on its face shows facts from which contributory negligence must necessarily be inferred, it is demurrable. *Smith v. Railroad Co.,* 80 S. C., 1, 61 S. E., 205; *Jarrell v. Railroad Co.,* 58 S. C., 491, 36 S. E., 910; *Elkins v. Railroad Co.,* 64 S. C., 563, 43 S. E., 19; *Cooper v. Railroad Co.,* 69 S. C., 479, 48 S. E., 458; *Branham v. Mill,* 61 S. C., 491, 39 S. E., 708; *Jones v. Boykin,* 70 S. C., 309, 49 S. E., 877; *Talbert v. Railroad Co.,* 72 S. C., 137, 51 S. E., 564; *Bamberg v. Railroad Co.,* 72 S. C., 389, 51 S. E., 988; *Lyon v. Railroad Co.,* 77 S. C., 328, 58 S. E., 12; *Steinmeyer v. Corporation,* 142 S. C., 360, 140 S. E., 695.

In *Lyon v. Railroad Co.,* 77 S. C., 328, 58 S. E., 12, the Court held that there could logically be no difference between sustaining a demurrer to the complaint upon the ground that it showed upon its face contributory negligence on the part of the plaintiff, and granting a nonsuit upon the ground that no other reasonable inference could be drawn from the evidence than that the plaintiff was guilty of such contributory negligence as would bar a recovery, and in many cases nonsuits and directed verdicts have been ordered upon this ground. So it appears that, in whatever form the question is presented, whether by demurrer to the complaint, by motion for a nonsuit, by motion for a directed verdict, or by a request to charge based upon a hypothetical state of facts, the question, whether or not the plaintiff was guilty of contributory negligence becomes one of law for the court, and not an issue of fact for the jury, where the facts from which the inference of contributory negligence alone can be drawn are stated, proved, or assumed.

It is suggested in the opinion of Mr. Justice Graydon that the exception cannot be sustained, for the reason that, as the verdict was for punitive damages, which implies a finding of wanton injury, the contributory negligence of the

plaintiff is no defense. It is very true that the contributory negligence of the plaintiff is no defense to a wanton injury by the defendant, but there is not a particle of evidence in the case tending to show any foundation for a finding of wanton wrong. It is not suggested that the plaintiff was ordered by a superior servant recklessly into a place of danger, or with the intent that he should be injured, and there is no reason to infer that, because the verdict was large, it necessarily included punitive damages.

I think, therefore, for the reasons stated, the judgment of the Circuit Court should be reversed, and a new trial ordered.

## ORDER REFUSING REHEARING

Upon reading the petition for rehearing in the foregoing matter, and upon consideration thereof, it is ordered that the same be and is hereby refused and dismissed.

> C. T. GRAYDON,
> *Acting Associate Justice.*
> EUGENE S. BLEASE,
> *Associate Justice.*
> JOHN G. STABLER,
> *Associate Justice.*
> JESSE F. CARTER,
> *Associate Justice.*

MR. JUSTICE COTHRAN (dissenting) : I think that there are two very substantial grounds upon which the defendant is entitled to a rehearing of this appeal:

(1) His Honor, the circuit Judge, should have sustained the objection of the defendant based upon the disqualification of the panel of jurors which tried the case.

(2) The defendant was clearly entitled to a charge of its second request, as it was presented, the modification of which constituted reversible error.

The second ground has, I think, been sufficiently elaborated in the dissent which I have filed. I shall therefore direct my attention to the first ground.

It is conceded that the panel of jurors which tried the case was drawn from a list prepared by the proper officers, in December, 1927, of at least one-third of the electors of Charleston County, qualified as such under the Constitution of this State, and that at the time of the preparation of the list the jurors were qualified electors under the Constitution, having been duly registered prior to December, 1927. It is conceded, also, that none of the jurors thus drawn to serve at the March term, 1928, of the Court of Common Pleas of Charleston County, at which the case at bar was tried, had in the meantime, between December 31, 1927, and March term, 1928, been re-enrolled, as it is contended the Constitution required.

There can be no doubt, under Const., Art. 5, § 22, that "each juror must be a qualified elector under the provisions of this Constitution. * * * The concrete question is presented, whether or not a citizen, who was a qualified elector in December, 1927, but who had not re-enrolled at some time during the year 1928, can be deemed a qualified elector when he is presented for jury service in March, 1928.

In Article 2, §8, of the Constitution it is provided: "The General Assembly shall provide by law for the registration of all qualified electors." Registration is therefore an essential element in the construction of a *qualified elector;* and, if a juror must be a qualified elector, it follows that he must be an elector *qualified by registration* in the manner provided by law, both constitutional and statutory.

In *State v. Mittle,* 120 S. C., 526, 113 S. E., 335, 338, the Court said: "Assuming, then, that registration is essential to the perfected status of a qualified elector, then it is clear that under the section first quoted a juror must be a registered elector, *and that he cannot be registered without complying with the requirements for registration."* (Italics added.) Reaffirmed in *State ex rel. Munn,* 129 S. C., 476, 125 S. E., 32.

The requirements of registration are prescribed, under the Constitution (Article 2, § 8, above quoted) by the Gen-

eral Assembly. They are (Section 202, Vol. 3, Code 1922) that the applicant for registration must be a citizen of this State and of the United States, 21 years of age, under no disabilities named in the Constitution, a resident for two years in the State, one year in the county, and four months in the polling precinct. He must have paid his poll tax six months before the election. He must be able to read and write any section of the Constitution submitted to him, or show that he has paid taxes on $300 worth of property, with certain exceptions enumerated.

This applies, of course, to the initial registration of the citizen. It, however, does not confer upon him a perpetual status as a qualified elector, except as to those who were registered prior to January 1, 1898, for Article 2, § 4, of the Constitution provides, as a condition of the continued validity of the initial registration, and "enrollment of [each and] every elector once in ten years." That is as essential as the initial registration, made so by the mandate of the Constitution. The section of the Constitution is as follows:

The qualifications for suffrage shall be as follows:

" *   *   * (b) *Registration.*—Registration, which shall provide for the enrollment of every elector once in ten years.   *   *   * "

The general enrollment is provided for in Section 211, Vol. 3, Code 1922:

"An enrollment of persons, not previously registered, and entitled to registration, shall be made annually by the board of registration until the year 1908, *when an enrollment of all electors shall be made,* and thereafter there shall be the same annual enrollment of electors *and the same general enrollment of electors every tenth year, as above provided.*"

At the session of the General Assembly of 1908 an Act was passed (25 St. at Large, p. 1429), entitled "An Act to provide for the re-enrollment and registration of the qualified electors of this State during the year 1908.   *   *   * "

This was manifestly passed to comply with the constitutional requirement above quoted. 1908 was the first year after 1898, in which the tenth-year enrollment was to be had. By the Act the supervisors of registraton were required "to re-enroll all the qualified electors in this State during the year 1908." Section 1.

At the session of the General Assembly of 1917, an Act was passed (30 St. at Large, p. 49), similar in its title and body to the Act of 1908, providing for the re-enrollment and registration of the qualified electors of the State during the year 1918. This was the second year after 1898, in which the tenth-year enrollment was to be had.

I do not find that a similar Act was passed for the re-enrollment during the year 1928, which was the third year after 1898, in which the tenth-year enrollment was to be had. I do not attach any significance to this apparent legislative omission. I hardly think that there was a legal necessity for such an Act. The requirement appears to have been sufficiently provided for in Section 211 above referred to. It seems to me clear, therefore, that a registration certificate issued after January 1, 1898, was perfectly good until December 31, 1907, and was then practically suspended until the holder became re-enrolled in 1908; that his certificate of enrollment, issued in 1908, was perfectly good until December 31, 1917, and was then practically suspended until the holder became re-enrolled in 1918; and that his re-enrollment certificate issued in 1918 was perfectly good until December 31, 1927, and was then practically suspended until the holder became re-enrolled in 1928.

As is declared in the *Mittle case*, 120 S. C., 526, 113 S. E., 335, 338: "If he shall have been registered after January 1, 1898, he remains a qualified elector *until the next enrollment period*" shall have arrived, at which time, to continue his status as a qualified elector, *he must re-enroll*. Can there be a doubt that if, at any time after January 1, 1928, any one of the jurors, who had not re-enrolled in

1928, had presented himself at the polls to vote, his vote could have been challenged upon the ground that he had not been re-enrolled during the period fixed by the Constitution and Statute?

All during the period from January 1, 1919, to December 31, 1927, certificates of registration to persons not theretofore registered were issued over the State. Regardless of when issued during that period, their active energy expired on December 31, 1927. A certificate may have been issued in December, 1927. It expired on the 31st, and the holder ceased to be a qualified elector for voting or jury service until he became enrolled in 1928. The Constitution and the statute declare that enrollment during 1928 is essential. It is conceded that none of the jurors complied with that requirement. I do not see how this Court can disregard the mandate of these laws. It is unfortunate that the situation has arisen—a case of *casus omissus,* with which this branch of the government is concerned only in a declaration of the law as it stands, without regard to the argument of *ab inconvenienti.*

It is declared in the opinion of Mr. Justice Graydon: "It is evident from the above provisions of the Constitution and Statute law that a new registration is required every tenth year, but nowhere in the Constitution or in the Statute is provision made for the time of the year at which this registration shall take place. All of these sections must be construed together, to give proper force to each, and only under a strained construction could it be held that it was necessary for every elector in the State to re-register on the 1st day of January of the tenth year in order to perform jury duty, provided he was otherwise qualified."

I do not understand that the defendant contends that it was necessary that the jurors should have re-enrolled "on the 1st day of January of the tenth year in order to perform jury duty." The contention, as I understand it, is that when they were presented for jury service in March, 1928,

they had not re-enrolled, as the Constitution and Statute required them to do, in order to be qualified electors, and therefore competent jurors. As the Statute fixes no period during the year 1928, at which this re-enrollment is to take place, I think that there can be no doubt of the proposition that a citizen whose certificate had expired on December 31, 1927, had the whole of the year 1928 in which to re-enroll, but that until he did actually re-enroll he was not a qualified elector or a competent juror. If he should have chosen to defer re-enrollment until December 31, 1928, whch he doubtless had the right to do, he must be held to have exercised that option with the concomitant disadvantage of inability to vote or to act as a juror during the whole of the year 1928.

Section 548 of the Code of Civil Procedure of 1922, which directs the preparation by the jury commissioners, in December of every year of a list of the qualified electors for jury duty during the following year, does not at all meet the constitutional objection raised. They could not have done otherwise than to include all who were at that time qualified electors. The question of their continued qualified status in the year 1928 was a matter with which the commissioners were not concerned. The list was no guaranty that between the time of the listing and their presentation for jury duty or voting they might not be disqualified for many reasons, one of which would be the failure to re-enroll in 1928.

In nine out of ten years the procedure adopted has worked no complication or confusion. It is only that they arise at the close of the tenth year, and to obviate them legislative provision might have been, but was not, made. The jury commissioners had the right to assume that one who was a qualified elector in December, and whose certificate would expire on December 31st, would qualify himself thereafter as the law required.

It is suggested that to adopt the defendant's contention would render it impossible to have any jurors during the

first three months of the tenth year. I do not at all take this view of the matter. If the citizen were informed of the duty incumbent upon him in order to preserve his highly prized privilege of voting, there is no reason why he could not exercise diligence immediately upon the expiration of the year to have his status restored or continued; nor is there any reason why the General Assembly could not make provision for an immediate general enrollment.

Harsh as it may seem, the situation is just this: The Constitution and the Statute say that the citizen under these circumstances is not a qualified elector until he re-enrolls. It is conceded that the jurors objected to did not re-enroll. They were therefore not qualified electors, and consequently not competent jurors.

I think, therefore, that the petition for a rehearing should be granted.

MR. CHIEF JUSTICE WATTS did not participate.