## 15330

STATE v. GRANT ET AL.

(19 S. E. (2d), 638)

October, 1940.

The order of Judge Grimball, ordered to be reported, follows:

This cause comes now before this Court on motion of counsel for the defendants above named for an order granting a new trial.

I have heard the matter thoroughly argued by counsel for the defendants and by counsel for the State.

Inasmuch as the defendants are under sentence of death, I have, following the *"in favorem vitae"* rule, carefully read and considered the entire record in the cause, and have given the matter careful consideration.

One ground of the motion is based upon asserted failure of a retained attorney to appear for and furnish representation to the defendants. It appears that this attorney had been employed on behalf of the defendant Grant immediately after his arrest and had conferred with the solicitor about the case, but just before the trial term he notified the Court that he was not employed to try the case, but only to try to plead the defendants guilty, and that if the matter was to be tried he would not and did not appear for and represent the defendants. It is claimed on behalf of the defendants that this attorney was retained the night before the trial to appear at the trial, and was paid a fee to do so, and that his failure so to appear constitutes a ground upon which the judgment and sentence rendered may be set aside by the Court. Affidavits have been filed in the record by this attorney and his secretary and associate tending to show that he was not retained to appear in the trial of the case, and had refused to agree so to appear, but that he was retained and

paid to furnish certain services outside of the Court, and that those employing him understood that he would not appear at the trial, and that he was not employed so to appear.

Being informed at the time of the arraignment that the attorney in question had notified the solicitor that he would not and did not appear for the defendants if the case were to be tried, the presiding Judge appointed two lawyers of the Berkeley bar, one being the dean of that bar in point of practice and the other a lawyer of more than twenty years' experience, to appear for the defendants in the trial of their case, and these attorneys did appear for them. When the case was called for trial, the Court was not informed of the employment of any retained counsel to appear for the defendants at the trial, and neither the defendants nor any member of their families, nor anyone on their behalf, brought any such fact to the attention of the presiding Judge or of any officer of the Court, or of any counsel for the prosecution.

Under these circumstances, whatever may be the merits of the contention between the retained attorney and those who employed him as to the terms of the employment and his alleged failure to carry the employment out, the Court committed no error in the conduct of the trial, and no basis is afforded in the showing for setting aside the verdict, judgment and sentence on this ground.

Other grounds upon which the motion is based assert that the Court-appointed counsel failed to furnish proper and efficient representation to the defendants. A careful consideration of the record compels me to a contrary conclusion. The counsel appointed by the Court appear from the record to have conducted the defense in a skillful and workmanlike manner, having due regard for the overwhelming and conclusive evidence presented against them. Their failure to achieve a better result was obviously due, not to any lack of zeal or skill on their part, but to the strength of the proof which the State presented against the defendants.

In the case of *Powell v. Alabama,* 287 U. S., 45, 53 S. Ct., 55, 77 L. Ed., 158, 84 A. L. R., 527, it was held that the failure of the trial Court to give a defendant reasonable time and opportunity to secure counsel was a clear denial of due process of law, and that in a capital case, where a defendant is unable to employ counsel, and is incapable adequately of making his own defense because of ignorance, feeble-mindedness, illiteracy, or the like, it is the duty of the Court, whether requested or not, to assign counsel for him as a necessary requisite of due process of law, and that that duty is not discharged by an assignment at such time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case.

Considered in the light of these principles, and in the light of the provisions of Sections 978-980 of the Code of Laws of South Carolina, 1932, I am of the opinion that the trial was conducted in accordance with the applicable principles of law, and that the rights of the defendant were duly protected, and that no basis has been established warranting the granting of the motion on these grounds.

The remaining grounds of the motion charge that the defendants were denied equal protection of the laws because there were no Negroes on the grand jury which indicted them or on the petit jury which convicted them, and that this was true because persons of the African race had been systematically excluded from the jury box from which the grand and petit juries were drawn in Berkeley County. In support of this contention there was filed with the motion an affidavit of counsel for the defendants containing figures as to the relative white and Negro populations in Berkeley County as shown by the 1930 census, the 1940 census figures not then being available, and this affidavit also shows that at the time of the making of the affidavit the registration books of Berkeley County contained the name of one Negro who had been registered prior to the year 1940, and the names of three more who registered during the year 1940.

In reference to this issue, the State has filed the affidavit of the two surviving members of the board of registration for Berkeley County, the other member having recently died, which affidavit shows that from the beginning of the re-registration in January, 1938, through January, 1940, only one Negro applied to the board for a registration certificate and that such certificate was immediately granted to him, and that no other member of the Negro race made application for a certificate of registration to the board during that period, and that none were refused registration during said period. The State also filed affidavit of the jury commissioners of Berkeley County which shows that the jury box out of which jurors for the year 1940 were drawn was prepared by the commissioners in December, 1939, as provided by Section 608 of the 1932 Code of Laws, as amended by Act appearing in the Acts of 1939, 41 St. at Large, at page 332. Another affidavit, made by the Clerk of Court for Berkeley County, filed by the State shows that the records of the Board of Registration are kept in the Clerk's office, and that he has examined the same, and that as far as he is able to ascertain therefrom only one Negro was registered as a qualified elector in Berkeley County in December, 1939, when the jury list for the year 1940 was prepared.

In *Norris v. Alabama,* 294 U. S., 587, 55 S. Ct., 579, 580, 79 L. Ed., 1074, the Court quoted the following from *Carter v. Texas,* 177 U. S., 442, 447, 20 S. Ct., 687, 44 L. Ed., 839, in relation to exclusion from service on grand juries: "Whenever by any action of a state, whether through its Legislature, through its Courts or through its executive or administrative officers, all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied to him, contrary to the Fourteenth Amendment of the Constitution of the United States." And it was also stated that: " * * * although the state statute defining the qualifications of jurors may be fair on its face, the con-

stitutional provision affords protection against action of the state through its administrative officers in effecting the prohibited discrimination."

In *Pierre v. Louisiana,* 306 U. S., 354, 59 S. Ct., 536, 83 L. Ed., 757, the evidence was held sufficient to establish that Negroes had been systematically and purposely excluded from the grand jury and that the exclusion was not due to their failure to possess the statutory qualifications of jurors.

It will be observed that it is undisputed that at the time the 1940 jury list was made up, only one Negro had registered as a qualified elector in Berkeley County, and under the applicable provision of the Constitution of South Carolina, he was the only Negro in the county who was eligible for jury service. The chance of this single qualified Negro juror being drawn upon the 1940 grand jury, or upon the venire of the petit jury, for that trial term, was infinitely less mathematically than the chance of his not being so drawn. The showing made convinces me that no other Negro had applied prior to the year 1940 for registration; that the officials had not denied registration to any member of the Negro race; and that there is no evidence tending to show any exclusion from jury service of the members of that race, systematically or otherwise. On the contrary, it appears that the jury lists and the jury box were made up, in the manner provided by law, from the qualified electors of the county, who had to be registered in order to be qualified electors, and that both the board of registration and the jury commissioners have performed their respective functions in accordance with the statutes in such case made and provided. The defendants do not question the validity of the constitutional provision requiring that jurors be qualified electors, and it is the failure of members of the Negro race in Berkeley County to exercise their rights under that constitutional provision, rather than any act of the State or its administrative officials, which accounts for the absence from the jury list of all of the members of that race except one in that county.

I am satisfied from my consideration of the record in the case that the defendants actually received that fair and impartial trial guaranteed them by the Constitution, and it is my opinion that there is nothing in the record which would legally warrant this Court in setting aside this trial, verdict and sentence.

It necessarily follows that the motion must be, and it is hereby, denied.

*Mr. Joseph Fromberg,* of Charleston, S. C., for appellants,

*Solicitor Robert McC. Figg, Jr.,* of Charleston, S. C., and *Mr. Norval N. Newell* of Moncks Corner, S. C., for respondent,

November 18, 1941.

(Following established custom, the Clerk of Court withheld publication of this opinion pending appellants' efforts to obtain a review by the Supreme Court of the United States. *Certiorari* was denied by the said Court April 6, 1942. See 62 S. Ct., 942, 316 U. S., 662; No L. Ed. J. I. W., Reporter.)

The opinion of the Court was delivered by MR. ASSOCIATE JUSTICE STUKES:

The excellent statement of facts contained in the brief of the State, filed by the Solicitor and his associate counsel, has been compared with the record and found accurate and is adopted for the purpose of the consideration of this appeal. It is as follows, omitting the interlinear references to the Transcript of Record:

On the evening of July 9, 1940, Jessie Lee Cumbee, a young white girl of the age of 15 years, who lived at Awendaw in Charleston County, but was visiting her brother at North Charleston in that county, went with her brother's permission for an automobile ride with Thomas A. Mitchum, who was her escort, and Herbert Hodge and Miss Dessie Miller. They left the home of Miss Cumbee's brother at a little after 8 o'clock, drove in Mitchum's car to a filling station where they drank Coca-Colas, and then went to the reservoir of the West Virginia Pulp and Paper Company's plant where they parked. It was drizzling when they reached the reservoir, and they sat in the automobile about a half-hour, when Mr. Hodge and Miss Miller got out and went for a walk around the reservoir, leaving Mr. Mitchum and Miss Cumbee in the car.

Shortly afterwards, another car drove up and stopped by the car in which they were sitting. A Negro man got out and came up to their car on the side on which Miss Cumbee was seated, and said that he thought it was Geneva's car. Mr. Mitchum told him that he had better be sure next time. The Negro man turned and went back to the car out of which he had gotten, but the car did not move. Instead, two Negroes came back to the Mitchum car, one on the side on which Miss Cumbee was seated and the

other on the driver's side on which Mr. Mitchum was seated. The man on the driver's side started hitting Mr. Mitchum over the head, striking him more than once, and he fell out of the car. Miss Cumbee got out and ran screaming around the edge of the reservoir, but the Negroes ran after her and grabbed her and put her in their car, which was a two-seated car, a sedan. She was placed in the front seat, and one of the Negroes drove while the other sat in the back seat.

Miss Cumbee asked them to take her to her home in North Charleston, and they said that they were taking her home, but did not do so. They drove through several woods roads, and finally stopped the car in a thicket, and took her out of the car. One of them threw her down and both of them forcibly assaulted her, after taking off part of her underclothing. After a time, she saw the headlights of another automobile coming through the woods, and one of the Negroes ran. The other took her farther into the woods and hit her over the nose with some kind of a weapon and ran. She screamed and ran toward the approaching car, in which were two county policemen searching for her, and when she ran out into the road in front of the headlights she was bleeding from the nose and mouth. She was taken to the hospital and treated for her injuries and on the following day was examined by Dr. W. K. Fishburne, an experienced physician.

Dr. Fishburne testified that there was considerable fresh blood on her petticoat; that she was quite bruised; that the tube from the bladder, the urethra, was very much bruised and swollen; that the lips of the vagina looked like they had been handled by the hand; that the hymen had been ruptured, and that an attempt had been made to enter her, but that the attempt had not succeeded because she was very much undeveloped; that there was no evidence that she had ever been handled in that way before, and that the injuries were recent enough for there to be fresh blood.

The evidence showed that after Mr. Mitchum had been left lying on the ground, beaten about the head, he had made his way to the highway about two blocks away, and when he could not get any farther some people came in answer to his cries for help. The police radio station in Charleston received a call, and broadcast directions to a county police radio car to go to the scene. In a few minutes the police car arrived at the reservoir and followed the tracks of the Negroes' car, which tracks were visible in the dirt roads because it was wet from the earlier rain. When the tracks ended, the officers heard a girl screaming, and she ran into the road in front of the headlights, bleeding from the nose and mouth, and was taken to the hospital.

The car was found in the thicket off the road, and since the keys were not in it, a wrecker was called to haul it in. The car was found and the assaults occurred in Berkeley County, about a mile north of the line between Berkeley and Charleston Counties.

The automobile used by the Negroes proved to be registered in the name of Edward Grant, and he and his brother Alchrist Grant, one of the appellants, were arrested that night, each at his own home. When Alchrist Grant was arrested, his home was searched but no wet clothing except a wet hat was found, although the clothing of a person who had run through the woods that night had to be wet. It was not until after Pinckney's arrest that the police got from Grant's wife the wet clothing on information given by Grant. Edward Grant and Alchrist Grant were placed in the Berkeley County jail on July 10th, the day after the assaults occurred.

County Policeman Knight, at the request of the Berkeley County authorities, then made an investigation in the community for further evidence as to the identity of the Negroes involved in the attack. As a result of this investigation, he located two material witnesses, Edward Bailey and James Hilliard, two Negroes living in the locality.

Bailey's testimony showed that on the night of July 9th, Alchrist Grant came to his home at about 10:30 or 11:00 o'clock, and knocked on his door and woke him; that Grant asked Bailey to get somebody to help him get home, as he had had a wreck and wanted to get home before the officers got him; that Bailey dressed and took Grant to the house of James Hillard, whom they woke; that Grant asked Hillard to take him home, and Hillard said that he didn't have enough gas but would take him if he would get some gas; that Hillard and Bailey drove Grant to his home at Liberty Hill in Hillard's model T truck, about two and a half miles, and Grant gave Hilliard 50 cents, with which they bought a gallon of gas and some cigarettes. Hilliard's testimony corroborated that given by Bailey.

The officers brought first Hilliard and then Bailey to the Berkeley County jail and confronted Alchrist Grant with them. As a result of this, Grant said that he was ready to tell the truth, and admitted his identity as one of the Negroes, and gave the officers the information upon which they arrested Cyrus Pinckney, the other appellant, and cast the whole blame on Pinckney.

When Pinckney was arrested he admitted his connection with the offense, and on the day after his arrest the appellants made statements in the presence of the solicitor, Miss Waring, the solicitor's stenographer, Sheriff Hill of Berkeley County, Mr. Finklea, deputy sheriff of Berkeley County, N. N. Newell, county attorney of Berkeley County, Chief D. S. Mott of the Charleston County police, and Officer Knight of the Charleston County police. These statements were taken in the Court room of the Berkeley County Court house and each was separately made, being taken down on the typewriter by Miss Waring as made by the prisoner. Grant read over his statement himself and then signed it. Pinckney could not read, but his statement was read to him by Mr. Newell and he confirmed it.

The defendants were then brought into the Court room together, and the statement made by each was read to the other. Pinckney, in the presence of Grant, repeated the facts to Grant as given in his statement, and every once in a while Grant would shake his head, and Pinckney would say, "Yes, you did," and when he did this, Grant would not deny it.

Every witness present at the taking of the statements testified that they were freely and voluntarily made, that each defendant was warned that he did not have to make a statement, and that if he did make a statement it would be used against him. There were no duress and no promises of any kind made to the defendants.

These confessions were offered and received in evidence at the trial and over objections by the defendants' counsel, and were read to the jury.

The defendants remained in jail from the respective dates of their arrest until the October, 1940, term of the Court of General Sessions for Berkeley County. Major J. D. E. Meyer of the Charleston bar was consulted by the family of Grant on the day after the crime occurred. During the period between July and the Court term in October, he spoke to the Solicitor several times about the case and the confessions were made available to him.

On the day before the term of Court convened, Major Meyer stated to the Solicitor that he did not represent the men if the case was to be tried, and that he represented them only if a plea of guilty would be accepted by the State. The Solicitor informed Major Meyer that no plea of guilty would be accepted and that the case would be for trial on some day during the term. Major Meyer then stated that he had a civil case in the U. S. District Court at Charleston which would be for trial on one day in the same week, whereupon the Solicitor stated that he was satisfied that the District Judge would arrange it so that the civil case did not conflict with this capital case. Thereupon Major Meyer repeated his statement that if the case

were to be a trial and not a plea he would not and did not represent the defendants.

The indictment was returned by the grand jury on Monday, October 21, the first day of the term, and the defendants were immediately arraigned. Upon the arraignment, they were asked whether they had counsel, and Grant stated that Major Meyer was his lawyer. The Solicitor thereupon fully informed the presiding Judge, Hon. A. L. Gaston, of the information given to him by Major Meyer, and Judge Gaston appointed Lewis G. Fultz, Esq., dean of the Berkeley County bar, and Hon. Marion F. Winter, a member of that bar for more than twenty years, and a member of the Legislature from Berkeley County for more than ten years, as counsel to represent the defendants in the cause. Charles Grant, a brother of Alchrist Grant, was in Court at the time of the arraignment, and when he asked whether he would have time to see Major Meyer before the trial he was assured by the Solicitor that he would. He was also placed in touch with Messrs. Fultz and Winter by the Solicitor and he conferred with them. Later in the week the Solicitor informed Major Meyer that the trial was set for Friday, October 25th, and Major Meyer informed the Solicitor again that if the defendants were to be tried he would not and did not represent them.

The case was duly called for trial on the date fixed, and the defendants were represented by Messrs. Fultz and Winter. They were found guilty by the jury without a recommendation to mercy, and were sentenced to death by electrocution.

After the expiration of the term of Court, but before the time for appeal had expired, Jos. Fromberg, Esq., was retained by the families of the defendants, and notice of appeal signed by him and by Messrs. Fultz and Winter was served.

After the Transcript of Record was served and agreed to, appellants' counsel served a notice of a motion for a

new trial on grounds which, in substance, questioned the sufficiency of the evidence to sustain the convictions, the alleged failure to make effective appointment of counsel for the defendants, the conduct of the defense by the Court-appointed lawyers, the failure of Mayor Meyer to appear for the defendant Grant, and the validity of the indictment and verdict because there were no Negroes on the grand jury and the trial jury panel.

In support of this motion, an affidavit was made by appellants' counsel which showed that there was only one Negro registered in Berkeley County, and affidavits of Charles Grant, Alchrist Grant's brother, and Felix Pinckney, Cyrus Pinckney's first cousin, in which it was stated that Major Meyer had been paid $50.00 in the case prior to the term of Court and the arraignment, and that on the night before the trial he had been paid $500.00 more, after which Major Meyer said that he was going to work out the case through the jurors, and he would take care of the situation, and for the family not to go to the trial.

In opposition to the motion, affidavits were filed by the State from the appropriate officials of Berkeley County in reference to the registration books and the preparation of the jury box for the county.

Major Meyer was apprised by the Solicitor of the service of this motion and the supporting affidavits, and he delivered to the Solicitor for filing in the cause affidavits made by himself, Miss Polhemus, his secretary, and D. S. Goldberg, Esq., his associate, which affidavits appear in the supplementary record. Major Meyer's affidavit admits the receipt of the $500.00 referred to in the affidavits in support of the motion, but states that he did not agree to appear at the trial, and so informed the Grants and Pinckneys, and that he went to the jail on the night before the trial and conferred with the defendants, and performed all services which he was paid for and which he agreed to perform, and that everyone understood, before and after the money was paid, that he was not to appear in the trial.

The motion was heard by Judge Grimball, and although the term of Court had expired and the motion was not one based upon after discovered evidence, he heard and considered it as if it were timely and properly made. He reserved his decision in order to consider the record as made by the agreed transcript as well as the supporting affi-, davits, and thereafter filed his order dated June 30, 1941, fully discussing the points involved and denying the motion. From this order, notice of appeal was duly served, and a supplementary transcript was served and agreed to.

The order of his Honor, Judge Grimball, denying the motion of the appellants for a new trial in the Circuit Court, will be reported as a part of the judgment of this Court. It is approved and affirmed and the exceptions challenging its correctness are overruled for the reasons hereinafter stated.

Instead of the usual independent statement of questions considered involved in the appeal, counsel for appellants has submitted an outline of his view of them, so following his lead we shall consider the questions as they are presented in his brief and in that order. Such consideration will be abbreviated as much as their importance will permit, particularly in view of the adoption of Judge Grimball's order.

The first contention relates to the right of the appellants to representation by counsel and the protection of it by the Fourteenth Amendment to the Constitution of the United States as it has been construed in the decisions of the Supreme Court. This right is, of course, well known and firmly established in this nation, but it is not a heritage from the English common law, as asserted by counsel, but is a departure from it. We note with interest and satisfaction that one of the earliest legal enactments (1731) referred to in the erudite discussion of the subject by Mr. Justice Sutherland in the opinion of the Court in *Powell v. State of Alabama,* 287 U. S., 45, 53 S. Ct., 55, 77 L. Ed., 158, 84 A. L. R., 527, is that of the Colonial Assembly of South Carolina. Grimke's S. C. Pub. Laws (1682-1790), page 130.

That Colonial Act survives as Section 979 of the South
Carolina Code of Criminal Procedure of 1932, as follows:
"Every such person so accused and indicted, arraigned or
tried, for any capital offense, shall be received and admitted
to make his full defense by counsel learned in the law and to
make any proof that he can by lawful witness or witnesses,
who shall then be upon oath, for his just defense in that
behalf."

And Section 980, also a part of the early law: "In case
any person so accused or indicted shall desire counsel, the
court before whom such person shall be tried is authorized
and required, immediately upon his request, to assign to such
person such and so many counsel, not exceeding two, as the
person shall desire, to whom such counsel shall have free
access, at all seasonable times, either before, at, or after the
said trial, any law or usage to the contrary notwithstanding."

In addition in Section 995 it is set forth that no person
shall be held to answer in any Court for an alleged crime
unless upon the indictment of a grand jury (with now in-
applicable exceptions), and Section 996 is as follows: "The
accused shall, at his trial, be allowed to be heard by counsel,
may defend himself, and shall have a right to produce wit-
nesses and proofs in his favor, and to meet the witnesses
produced against him face to face."

These Code sections are in conformity with Section 18 of
Article I of the present State Constitution, 1895, containing
guaranties of the rights of an accused person in criminal
prosecutions, among others "to be fully heard in his defense
by himself or by his counsel or by both."

The counsel who accepted employment of at least some
sort by the relatives of one of the appellants is not now on
trial and his conduct thereabout is not properly subject to
inquiry in this litigation. His connection with it was stated
to the Court by the solicitor upon the arraignment of the
appellants and that the attorney had informed him, the so-
licitor, that he would not appear at the trial. Thereupon the
presiding Judge appointed to defend the appellants two high-

ly esteemed members of the bar of the forum, known to the members of this Court personally and by reputation. One of them is the oldest practitioner there and still able, alert and active, and the other of approximately middle age with over twenty years of trial experience, prominent as a lawyer and in public life, having been a member of the legislature of the State for more than ten years. Both are gentlemen of high character and attainments, sensible of their obligations as lawyers and officers of the Court. We think that criticism of their conduct of the defense is without foundation; the details of such criticism will be dealt with *infra*.

The appointment was on the first day of the term, Monday, and the record shows consultation between counsel and a near relative of one of the accused. Naturally it is silent upon their subsequent conferences and other preparations for the trial. For the purpose of setting the time of the latter, the case was called on the succeeding Wednesday and the trial was set for Friday. Surely this was not undue haste. The crimes had been committed months before.

Attack is made in argument upon the remark of one of appellants' counsel made at the opening of the trial on Friday upon inquiry of the presiding Judge as to whether they were ready, as follows: "If it may please the Court, I don't see how it is possible for anybody to be ready in the few days we have had. Mr. Fultz and I are here at the direction of the Court, and we will proceed with that understanding." He was not joined in that statement by his associate, and it should be remembered that they had been appointed Monday prior and counsel who spoke had appeared on the preceding Wednesday and suggested that Friday be fixed for the trial. We think that nothing can be properly made of the remark; it seems to have been dictated by modesty and by counsel's realization of the gravity of the situation of his clients.

Criticism is aimed at counsel for the remark of Mr. Fultz to the principal prosecuting witness, the victim of the attacks, in lieu of cross examination, as fol-

lows: "Young lady, I think you have been through enough. Come down. I don't want to put you through any more." But to the members of this Court, all of whom have in the past been trial lawyers, it is easy to recognize good strategy in this course. The witness had not identified the defendants, which was natural in view of the darkness at the scene of the crimes and her failure to identify the appellants at the time of trial rather bespoke her veracity, and under the circumstances cross examination of her would probably have aroused the sympathy of the jurors more than anything else. It is probably true as often said that more cases are injured by too much cross examination of adverse witnesses than too little.

A further criticism of appellants' counsel is that they should have moved for a change of venue and insisted upon the trial of appellants in their home county, Charleston. They lived near the county line, but the crimes were committed about a mile within the boundary of Berkeley County. In this position counsel evidently overlooks the fact that the victim also lives in Charleston County and she was probably more a stranger in Berkeley than were the appellants, and certainly the presence of her acquaintances on the jury or of her relatives who might be acquainted with members of the jury, in the Court room during the trial, would bode no good for the defendants. There is no semblance of a showing of public prejudice or passion against the defendants in Berkeley County. Section 35, S. C. Code, 1932.

The experienced Judge had occasion to remark during the trial, preserved in the record, that the scene was the quietest of the kind that he had ever witnessed, and that there was no evidence at all of any hostility toward the defendants.

This Court had under review in *State v. Bethune*, 93 S. C., 195, 75 S. E., 281, 282, conduct of the defense in a capital case by a counsel who admittedly was partially mentally deranged. There the Court well said, applicable here, that such was no ground for a new trial because there was

no showing of prejudice, and: "It does not appear that he did or left undone anything which would probably have affected the result. If there had been any apparent prejudicial mismanagement of the case, we feel sure that it would not have escaped the vigilance of the presiding Judge, who would have taken the necessary steps to safeguard the defendants' rights."

In connection with this and other allegations of error ■ we remark that appellants' present counsel's zeal has led him into the making of unfounded charges and we quote Mr. Justice Woods, afterward a member of the Federal Circuit Court of Appeals, speaking for this Court in *State v. Weldon,* 91 S. C., 29, 74 S. E., 43, 44, 39 L. R. A. (N. S.), 667, Ann. Cas., 1913-E, 801, also cited with approval in *State v. Bethune, supra:* "Verdicts should not be set aside by an appellate Court for misconduct in a trial, unless the evidence is clear and convincing that extraneous influences so interfered with the conduct of the trial, or so pressed upon the jury, as to become factors in the result. A vast number of cases might be cited to show that *this Court will refuse to heed unsubstantial charges that trials have not been fair."* (Emphasis added.)

Complaint is also made against the admission in evidence over objection of the "confessions" of the appellants and of the remarks of the Judge concerning his ruling and finding that there was no evidence that the statements were not made freely and voluntarily, but on the contrary that the evidence established the admissibility.

There is no evidence of objectionable "third degree" methods on the part of the officers or others which would bring the case within the rule of *Chambers et al., v. State of Florida,* 309 U. S., 277, 60 S. Ct., 472, 85 L. Ed., 716, relied upon by appellants. Incidentally, the law upon the point is the same in this State and is well established and settled by many decisions. See the South Carolina cases in 10 West's South Carolina and South Eastern Digest, Criminal Law, 517 to 538, inclusive.

The record is utterly devoid of improprieties on the part of the officials. The statements were given in the calm of an otherwise unoccupied Court room and were typed by a lady stenographer as made and thereafter read over and signed by the literate appellant and that of the illiterate was read to him after the typing. We find ground only for commendation of the officers concerned and their activities as disclosed by the record.

Appellants' counsel, at the trial by their questions appear to have attempted to create a suspicion of the nature of a certain cell in the county jail which they called in questioning the "sweat box", but there was no direct evidence that either of the appellants had ever been there confined and it developed that it was only used at intervals for the brief accommodation of new incoming prisoners, and that it was mainly utilized for the storage of confiscated liquors. There is not an iota of evidence of any abuse or mistreatment of the appellants during their imprisonment and trial.

The attorney for Berkeley County, associated with the State's solicitor in the prosecution, testified that in his conversation with one of the appellants after he was taken into custody in Charleston and on his way to the Berkeley jail, over a week before the confessions were signed, that he had better stay in jail and reflect upon the crime as he, the attorney, would see whomever committed it "burn". That was the only conversation, a casual one and in an automobile, and it was with only one of the appellants and more than a week, as stated, before the statements were made and signed. We cannot find that the latter were induced or influenced by the stated threat, if the words may be fairly so construed.

The course of the Court with respect to the statements can be no better set forth than the quotation of his instruction thereabout to the jury, as follows: "Now, as to an alleged confession. I can give you only the law. When an alleged confession is relied on by the State, you should give it such weight as you think it is entitled to. When an alleged con-

fession is relied on by the State, the jury, under the law, should give that confession, and every part of it, whether favorable to the defendants or unfavorable, such weight as you think it is entitled to. And in hearing any of the evidence, you have a right to consider whether the testimony is corroborative of other testimony, and whether it is consistent or reasonable. And when you consider an alleged confession, you give it such consideration as you give all the other evidence in the case; and give it such weight as you think it is entitled to. And that does not mean that you are bound to believe an entire confession, or each and every part of a confession that convinces your mind of its truth, just as you can believe any other testimony in the case. But I charge you this; where two persons are charged with crime, and the confession of one implicates the other, you cannot consider it against the other, because a confession can only be considered against the one who made it. That would be true with regard to one or more confessions. When one or more confessions are introduced in a case, the confession of one cannot be considered against the other; but it is your duty to weigh the alleged confession and give it such weight as you think it entitled to with regard to the party making it."

In other portions of his charge to the jury the able and conscientious Judge repeatedly properly told them that they were the sole judges of the facts, which he could not even comment upon, and that they exclusively should find the facts, judge the credibility of the witnesses and the force and effect to be given their testimony. The charge in this respect was crystal clear.

The sole remaining question for consideration is the contention of the appellants which is based upon the fact that there were no colored persons upon the Grand Jury which returned the indictment against them or upon the petit jury which tried and convicted them. Their counsel argues that the 1930 population figures for Berkeley County which he

submits, showing more colored than white residents, prove exclusion of colored persons from the juries of that county and establish a violation of the Fourteenth Amendment to the Federal Constitution and the Act of Congress upon the subject, 18 U. S. Stat., 336, 8 U. S. C., § 44, 8 U. S. C. A., § 44. This contention is so well considered and disposed of by the Circuit order of Judge Grimball (adopted as a part of this judgment) that little can be added.

Article 5, Section 22, of the State Constitution (1895) specifies the qualifications of jurors, as follows: "Each juror must be a qualified elector under the provision of this Constitution, between the ages of twenty-one and sixty-five years and of good moral character." Article 2 prescribes the qualifications of electors and provides for their registration, all without difference or distinction because of race or color. Statutes conforming are found in Chapter 100, S. C. Civil Code, 1932, Section 2267 *et seq.* A "qualified elector" is a registered elector, and each grand and petit jury must under these constitutional and statutory requirements be a registered elector. *State v. Rector,* 158 S. C., 212, 155 S. E., 385.

That this is not an unusual requirement in the various states is indicated by the following quotation from 31 Am. Jur., 652, Jury, Section 125: "However, a common requirement or qualification is that a juror (must) be a qualified elector or voter of the county  *  *  *." It is not contended that it is an unreasonable or unfair requirement.

1938 was a registration year, that is, one must have registered and obtained a certificate during that year or afterward to have been a registered, qualified elector at the time the juries here involved were drawn. *Veronee v. Charleston Cons. Ry. & Lighting Company,* 152 S. C., 178, 149 S. E., 753. The record is clear that the jury commissioners of Berkeley County met in December, 1939, pursuant to Sections 608, 609 of the Code of Laws of South Carolina for 1932, as amended by Act No. 321 of 1933, 38 St. at Large, page 446, and by Act No. 219 of 1939, 41 S. C. Stat., 332, and prepared and filled the jury box.

The record is also clear that at that time there was only one colored citizen of Berkeley County who had applied for registration since January, 1938, and he had been found qualified and was granted a certificate, so that at that time there could have been only one colored person eligible for jury service; we do not know whether his name was in the box; there is no evidence of the exclusion of it, intentional, arbitrary or otherwise; and certainly his mathematical chance of service, if included in the venire, was extremely slight.

It should be added that in the record his name appears with the title "Reverend," indicating that he is a minister. Ordained ministers of the Gospel are exempt from jury service under the express terms of Section 629, S. C. Code of 1932. Thus it appears that no nonexempt member of the colored race was eligible for service upon the juries of Berkeley County at the time those involved in this appeal were drawn and impaneled, so there could have been no exclusion on account of race or color.

We quote again from 31 Am. Jur., page 619: "However, a Negro or member of any other race who is on trial is not entitled to a mixed jury composed of members of his own race and members of the white race, and the arbitrary exclusion of members of his race from a jury cannot be inferred merely from the fact that no one of that race is on such jury. No such right to a mixed jury is guaranteed by the 'equal protection of the laws' clause of the Fourteenth Amendment. All that one is entitled to is that members of his race who are qualified shall not have been arbitrarily excluded."

It is established in the record that no colored person was refused registration; the one applicant within time and prior to the drawing of the questioned juries was promptly registered; and there is no evidence of any deterring influence or action from any source or on the part of any one. On the other hand the record discloses that during the following

year several other colored persons were registered by the board and thereby became eligible for jury service.

We repeat the finding of the lower Court that there is no evidence in the record even tending to show any illegal exclusion from jury service of members of the colored race, hence the case does not come within the rule of the several decisions cited by counsel. *Vide, Smith v. Texas,* 311 U. S., 128, 61 S. Ct., 164, 85 L. Ed., 84.

In conclusion it should be said that this Court has not overlooked the rule *in favorem vitae* or the duty of an appellate Court in a capital case to search the record for prejudicial error, including the violation of the applicable provisions of the Federal Constitution; and in this case careful consideration has been given to the contents of the record, appellants' exceptions and all of the positions taken by their counsel in argument and no rules of procedure have been invoked to frustrate his efforts, just as the solicitor properly made no point as to the time of the making of the motion for a new trial or any of the grounds upon which it was laid, and in all of this we have had in mind the unusual circumstance that appellants' cause has been presented by counsel other than those who conducted the trial defense.

Incidentally, this Court derives no satisfaction from the affirmance of the death sentence, but such is the penalty under our law for the crimes of which the defendants have been convicted in a legally constituted Court in a trial which we find met the requirements of the pertinent portions of the Federal and State Constitutions and Statutes, and was fair and just and free from error.

All of the exceptions have been considered, whether expressly referred to or not, and are overruled, and the judgment below affirmed.

MESSRS. ASSOCIATE JUSTICES BAKER and FISHBURNE, and CIRCUIT JUDGE L. D. LIDE, ACTING ASSOCIATE JUSTICE, concur.

CIRCUIT JUDGE A. L. GASTON, ACTING ASSOCIATE JUSTICE, did not participate.