15796

STATE v. MIDDLETON

(36 S. E. (2d), 742)

*Mr. A. L. Hamer,* of Charleston, Counsel for Appellant, and *Vito Marcantonio* and *Herman Rosenfield,* both of New York, N. Y., for *amicus curiae*

*Solicitor Robert McC. Figg, Jr.,* of Charleston,

January 26, 1946.

MR. ACTING ASSOCIATE JUSTICE A. L. GASTON delivered the unanimous Opinion of the Court.

Arthur Middleton, a young Negro 21 years of age, was tried in the Court of General Sessions for Charleston County on the charge of assault with intent to ravish, and was found guilty by the Jury with recommendation to mercy and was sentenced by Honorable Shepard K. Nash, Special Presiding Judge, to serve a term of 25 years. The indictment also contained a second count charging the defendant with assault and battery of a high and aggravated nature, which is a lesser offense and was an alternative count.

The heinous crime followed the usual pattern of such uncalled for and unprovoked criminal acts, being perpetrated

in the sparsely settled rural community, with no one present except the helpless 19-year-old woman and the attacker. She was at her home in a small two-room cottage, situated on James Island on the farm of W. E. Townsend, on the day in question while her husband, Jesse Marvin Price, was absent at work in the Charleston Navy Yard. They had occupied this humble home for about one month; she and her husband coming from other parts of the State to enable him to engage in this Government Work. The house bordered on a field road, upon which was also located the small cottage of Mr. Olin Hartley and his wife, as the nearest neighbors; the Hartley house being midway between the Price cottage and the Townsend house which bordered on the west side of the main road known as Secessionville Road. Across this latter road on the east side, opposite the Townsend house, lies the plantation of Dr. Hope, entered between two brick pillars, upon which Laura Jackson, grandmother of the defendant, lived. The defendant, Middleton, lived farther west on the Grimball road, which appears by the diagram in evidence to cross the Folly Beach road, and also to cross the Secessionville road, these last two being parallel.

On the fateful day, September 7, 1944, at about 2:30 P. M. in the afternoon, Mrs. Nellie C. Price while indoors ironing clothes saw this Negro man approaching by a path through the field behind her house coming from the direction of the road to Folly Beach. Mrs. Price did not know her assailant and had never seen him until this day when the crime was committed. But she readily identified him later and testified that he was Arthur Middleton. He came to her home twice within a very short time that afternoon on the pretense of looking for Olin Hartley and concealing his real purpose by asking for a drink of water. When she was in the act of getting the water bottle out of the icebox he started entering in at the door but was told to remain on the outside. On his second appearance he said "open the

door I got some mail for Olin." He then left, going in the direction of Mr. Townsend's yard. Finally he returned the third time to her home through a field of growing corn, which hid the view of his approach and also of the Townsend house, with a demand on his part to her to open the door, saying: "What you got your house all locked up for? You scared I am going to interfere with you? I am coming in through the screen. I will bust the screen out." He told her he was going to shoot her and he had something up to the screen but she could not say that it was a gun.

Her testimony in regard to the crime is as follows:

"There was another door on the other side, and I went to that door, and every time I would go over to another door, he would come to that one, and I would go to the other door, and he would come to that one. I finally caught him at the corner of the house, and I got out one door, and I ran toward Olin's screaming, and he ran after me and caught me and jumped on my back—he told me before that, that he was going to shoot me, and he had something up to the screen—he jumped on my back and he hit me in the head with something, and I fell down in the corn field, and he fell on top of me, and tore my underclothes.

"Q. Did he do anything else? A. No, sir. He had his clothes unbuttoned, and had everything out.

"Q. Did he or not try to have intercourse with you A. Yes, sir.

"Q. Then what did you do? A. I kicked him in the stomach, and he rolled over in the road, and I got up and ran to Mr. Olin's screaming."

The evidence in this case clearly shows a criminal intent and assault upon her, an invasion and the violation of the sanctity of her dwelling and that she was chased out of her own home and fled for her safety; and that he made a brutal and evil assault on this young woman, and the bold and

dastardly attempt upon her person, which was defeated only by her good fortune and presence of mind and by her frantic efforts when she escaped, screaming for help to her nearest neighbor's home, with her clothing torn and covered with dirt, with sand spurs all over her, her legs scratched up and her hair mussed up; pale and bloodless, almost scared to death, when she got to the Hartley's home.

The appeal to this Court comes from the verdict of the jury and the sentence of the Court upon eleven exceptions, all of which have been carefully considered after argument of counsel. When the case was called for trial at the March, 1945, term the defendant's attorneys made a motion to continue the case until the next term on the ground that they did not think they had sufficient time to prepare the case properly for trial. This motion was overruled. It appears by the record that this case was first tried at the September, 1944, term of Court when the defendant was represented by an attorney of his own selection and that the case resulted in a mistrial. At the next term the case was set for trial on December 15, 1944. On December 14th, the defendant's attorney appeared in open Court and stated to the Presiding Judge that he had withdrawn from the case and had returned to him the entire fee which he had received. The Presiding Judge inquired of the defendant in open Court whether he had agreed to the withdrawal from the case of his attorney, and when he answered in the affirmative the Presiding Judge permitted the attorney to withdraw, and continued the case to the March, 1945, term of Court in order to afford him ample time in which to employ other counsel, if he so desired.

At the March, 1945, term, the Solicitor called the case on March 5th, the first day of the term, for the purpose of fixing a day for the trial. The Presiding Judge asked the defendant in open Court whether he had an attorney, and when he answered, in the negative the Presiding Judge ap-

pointed Messrs. A. L. Hamer and Joseph Fromberg, attorneys of the Charleston bar, to represent him. The appointment was made on March 6th, and the case was set for trial 8 days later, *viz*, on March 14, 1945. ·

On March 13th, the day before that fixed for the trial, the attorneys for the defense made three motions as follows:

First, a motion for a continuance to the next term of Court, on the ground that the Court appointed attorneys did not think that they had had sufficient time to prepare the case properly for trial.

Secondly, a motion to quash the indictment on the ground that there were no persons of the Negro race upon the grand jury that returned the true bill at the September, 1944, term of Court, as the Court records showed.

Thirdly, a motion for a continuance on the ground that no persons of the Negro race had been drawn to serve on the petit jury panel for the week of March 12, 1945, in which week the case was set for trial, it being customary to draw a separate petit jury panel for each week of Court.

The judge who tried the case refused the motion to continue on the ground that counsel did not have sufficient time to prepare for trial. The Judge held that they had been furnished with transcript of the previous trial and had been given all information possible and that there were not sufficient grounds to continue the case. It also appeared that a witness who was absent when the motion was first made, Mrs. E. E. Williams, had arrived the night before from Philadelphia and she was present and testified in behalf of the defendant. Appellant's counsel had at least eight days in which to prepare for the trial of the case after their appointment by the Court and the entire record established beyond all peradventure that counsel ably, zealously and indefatigably performed their duty. The motion for a continuance for lack of time for preparation was

properly refused and the defendant has in no wise suffered or been prejudiced on this account.

The real issue in the case centers around the refusal of the motion to quash the indictment for lack of Negroes on the petit jury which rendered the verdict and also on the grand jury which found the true bill on the indictment.

The Solicitor was very willing to go fully into the facts and called upon all three members of the jury commission to testify and also upon the Deputy Clerk of Court as a witness. Their evidence shows conclusively that no discrimination is exercised and no purposeful plan resorted to in an unlawful effort to exclude Negroes from the juries of Charleston County, nor anywhere else within this State. In fact the evidence in this case is all to the contrary. The conscientious but gratuitous argument of counsel to impugn the motive and conduct of the Courts of this State in order to corruptly, or even unjustly deny to the defendant the equal protection of the laws, and to violate the Federal Constitution and the laws of the United States, is the only tangible manifestation of such alleged monstrous misconduct upon the part of the citizenship and public officials of Charleston County. As a matter of long-established public policy and within the judicial knowledge of the Courts every effort is exerted to protect the most humble citizen who is so unfortunate as to violate the laws of the State and to be brought to trial in a court of justice. The sole purpose of the law under discussion is to administer justice equally, fearlessly, and fairly, conformable to the decisions of the United States Supreme Court by which the enlightened conscience of those who make the laws and of those who execute the laws enables these public officials to fully perform the duties of their office and to administer justice consonant with the familiar requirements of the Federal decisions and the long-established rights of its people. The equal protection of the laws extends to the guilty

as well as the innocent; to those who do not break the laws and whose rights of protection from force, violence, and rape have been violated as well as to those who ruthlessly attack a defenseless and unprotected woman in the peace and quiet of her own home. The law-abiding citizen is also entitled to the equal protection of the laws. The defense contends that their concern is "with the broad social implications involved," and that in one way or another the concept of a representative jury has been violated. This is not true.

The major premise of this diatribe is that a majority of the citizens of the State are disqualified as jurors by their inability to pay the poll tax. This issue does not arise out of any facts in the case nor was it even raised in the Court below.

So far as the laws of this State are referred to, no attack upon their constitutionality is entertained by this Court who refused to grant permission on the appeal to inject an issue foreign to the facts and contrary to the matters presented to the Judge who tried the case. This Court readily granted leave to the attorneys from the New York bar to appear in the case and extended to them the privilege of filing a brief in behalf of the appellant which they have done. Their appearance is set forth in the brief to be in behalf of sundry organizations and the name of each organization will be reported by the Clerk of this Court and duly printed as a part of the record herein.

The Constitution of this State requires that each juror must be a qualified elector under provisions of the Constitution, between the ages of 21 and 65 years and of good moral character. The petit jury shall consist of twelve men, all of whom must agree to a verdict in order to render the same. Art. 5, Sec. 22, Const. 1895 of South Carolina. This means a registered elector and applies

to grand jurors and petit jurors. *State v. Grant,* 199 S. C., 412, 19 S. E. (2d), 638, and cases cited, including 31 Am. Jur., 652, Jury, Section 125; and page 619.

The qualifications for a registered elector are:

1. Residence in the State for two years, in the County one year and in the polling precinct four months.

2. Registration which shall provide for enrollment of every elector once in 10 years.

Any person who can both read and write any section of the Constitution submitted to him or can show that he owns and has paid all taxes collectible during the previous year on property in this State assessed at $300.00 or more who shall apply for registration after January 1st, 1898 shall be registered. Art. 2, Sec. 4, Const. 1895. Unless a person applies for registration, of course, his name is not enrolled and he would never be called as a juror. There is no evidence in this case that any Negro anywhere in the State has ever applied and been refused registration if he can both read and write or owns $300.00 worth of property, nor has any Negro ever appealed to the Court on the ground that he has been denied such right, as provided by Art. 2, Sec. 5 of the Constitution of 1895.

It will also be observed that a registration certificate is good for 10 years and may be renewed if lost and also that an enrollment during each and every year of every elector not previously registered is provided for.

But during the entire 10-year period, or fraction thereof, if not applied for sooner, a registered qualified elector is a potential and duly qualified juror, and his name may be taken from the registration books by the jury commission. In other words, if he never votes but is a registered elector he is qualified to serve as a juror and the jury commissioners have no way to ascertain whether he had voted or wishes to vote. The jury duty is based on the 10-year registration,

no payment of taxes is necessary or required. Section 608 of the Code of Laws of South Carolina, 1942, recognizes that the possession of a registration certificate is the only qualification for jury duty, if the juror is between the ages of 21 and 65 years, and of good moral character. We are not discussing the privilege of voting, but only the 10-year registration period as a prerequisite to jury duty. The Courts are always open to those who may be denied the right to register, and this is expressly provided by the Constitution of this State under Art. 2, Sec. 5.

So that Appellant seeks to make a mountain out of a mole hill and to try in this case the right of his fellow Negro citizens of this State to become registered electors and eligible for jury duty when no facts to sustain this contention are shown by the record.

■ A juror does not have to pay a poll tax to sit on a case. *State v. Mittle,* 120 S. C., 526, 113 S. E., 335.

■ Even if payment of a poll tax is a prerequisite of voting this does not deny any privilege or immunity under the 14th Amendment. *Breedlove v. Suttles,* 302 U. S., 277, 58 S. Ct., 205, 82 L. Ed., 252.

■ All the requirements for registration and jury duty apply equally to the White and Negro races.

The law of this State under the Constitution of 1895 is entirely fair and has always been administered with meticulous care in the Courts and by all officials of the State.

■ The Constitution of the State requires either an educational qualification or a property qualification, but does not require both. It is common knowledge that under the law of this State free public schools are maintained by the State appropriation for the education of the Negro race, and also higher State Institutions of learning. The State enables the Negro race to become educated and to become qualified thereby to register for voting. The school

system also complies with the Federal law to pay Negro school teachers the same salary scale as White teachers. No discrimination is practiced or attempted.

A motion is not evidence. In the case of *Brownfield v. South Carolina*, 189 U. S., 426, 23 S. Ct., 513, 514, 47 L. Ed., 882, the plaintiff in error who was convicted of murder appealed on the ground that his motion to quash the indictment because the grand jury was composed wholly of White persons, and that all Negroes although constituting four-fifths of the population and of the registered voters of the County were excluded on account of their race and color. The United States Supreme Court held that the formal words of the motion were not enough. It was necessary for the defendant below to make an attempt to introduce evidence. The Court said "the trouble with the case is that we are not warranted in assuming that the allegations are true," and the judgment was affirmed, and appeal dismissed.

The more recent case of *Franklin v. State of South Carolina*, 218 U. S., 161, 30 S. Ct., 640, 54 L. Ed., 980, likewise holds that it is essential to aver and prove such facts as establish this contention. That case also discusses and quotes Art. 2, Sec. 4 of the Constitution of South Carolina of 1895 in regard to the qualification for suffrage and for voters and said that the South Carolina Supreme Court held that the Constitution of 1895 laid no restriction on color or previous condition to entitle one to be an elector. The case also holds that there is nothing in the Act of Congress of 1868 to prevent the selection of grand jurors having the qualifications prescribed for electors in the Constitution of 1895, in the absence of a showing that such legislation operated to exclude citizens from such juries on account of race.

The U. S. Supreme Court also holds that it "has no jurisdiction to notice other (alleged) errors than those which involve alleged violations of Federal rights secured by the

Constitution of the United States or Federal statutes. The states have the right to administer their own laws for the prosecution of crime, and the jurisdiction of this court extends only to reversal of such state proceedings where fundamental rights secured by the Federal law have been denied by the proceedings in the state courts." *Franklin v. South Carolina,* 218 U. S., 161, at pages 164 and 165, 30 S. Ct., 640, 641, 54 L. Ed., 980; *Rogers v. Peck,* 199 U. S., 425, 26 S. Ct., 87, 50 L. Ed., 256, and cases there cited.

In passing it is pertinent to say that Art. 2, Sec. 4, Constitution of 1895 of South Carolina as quoted in the *Franklin Case, supra,* has been amended, by the South Carolina Act of 1929, 36 Stat. at Large, 695, and of 1931, 37 Stat. 105, 246, to conform to the terms hereinbefore set forth. Of course, any legislation under Section 2267 of the Code of 1942 must yield to and conform to the Constitution.

We could well dismiss the appeal at this point and stop here but under the rule of this State all exceptions must be considered and separately passed upon on an appeal.

Our concern is now and always to comply with the well-known and fully understood and discussed principles of justice under the decisions of this Court and of the United States Supreme Court. The State of South Carolina is not recreant nor recalcitrant in following the Federal laws in the selection of a jury and in requiring that Negroes be drawn to sit as jurors and that their names be included with others in the jury box. If no Negroes are drawn at any one term of Court it is merely incidental to the usual and customary method of presenting the names of the jurors for each week. The law of this State requires that only 12 new men be drawn once a year to serve as grand jurors for that year and that these 12 with 6 hold-over members from the grand jury of the preceding year shall constitute and comprise the grand jury. Their names are all drawn by lot, each being enclosed in a separate capsule from a box containing at least

one-third of the registered qualified male electors of the County of Charleston, between the ages of 21 years and 65 years as shown on a list prepared from the official enrollment books of qualified electors, of good moral character as more fully set forth in Section 608 of the Code of Laws of South Carolina for 1942. The 12 members of the grand jury to serve for an entire year are drawn from the aforesaid box, and also the names of 36 men to serve as the petit jurors for each week of the Court of Common Pleas and of General Sessions. The Tales Box contains the names of not less than 100 nor more than 800 of such of the persons whose names appear on the said list as residing within five miles of the court house from which tales box shall be drawn jurors to supply deficiencies arising from any cause or emergency during the sitting of Court. The jury commissioners are required to carry out all of the provisions of law for the preparing of the list of jurors' names and for drawing their names for service at Court. The commission shall cause the names on the jury list to be written each one on a separate paper or ballot, (the paper to be plain and not marked, to be exactly alike, and not visible from the outside), and shall place each of said ballots or separate papers in a separate small opaque capsule, or container, which shall be uniform in size, shape and color and drawn by lot in this manner to constitute the jury for the venire for each week of Court. See Section 609, Code 1942. This method keeps inviolate the entire jury system of the County of Charleston and of the State of South Carolina.

The three jury commissioners of Charleston County are all men of the highest character, probity and integrity. Their testimony under oath in this case is unimpeachable.

The clerk of court who is one of the commissioners was examined in detail about the make-up of the jury list and jury boxes for the period from July 1, 1944, to June 30, 1945. He testified that there were 16,055 registered electors

as of July 1, 1944, whereof 799 were Negroes. The percentage of Negro registered electors was 4.98 per cent. of the total registration of 16,055. Of the 799 Negro registered electors, 453 were qualified male electors and of these more than 100 were on the jury list and in the jury box. The total number of names on the jury list and in the jury box was 3,400. It will be seen, therefore, that the percentage of the Negro qualified male electors on the jury list and in the jury box was not greatly disproportionate to the percentage which the total Negro registered electors bore to the total of all registered electors, and some mathematical difference one way or the other is to be expected, taking into consideration the possible variation in the percentage of female registered electors, in the percentage of those free from all legal exceptions, in the percentage of those between the ages of 21 and 65 years, as well as the possible variation to be expected when the other qualifications set forth in section 608 have been applied to the registered electors by the jury commissioners.

It was brought out that the registration commissioners in many cases put a "c" by the names of Negroes who registered, and that the jury commissioners could tell from this that such persons were Negroes. They testified positively, however, that they did not exclude any such persons because of their race or color; the clerk of court testified that they were careful to see that they got a good percentage of the Negro qualified electors, male electors, in the box; and the county treasurer, also a jury commissioner, *ex officio*, testified that in his 23 years of service as a jury commissioner he has always put good colored people in the box.

It must be clearly understood, and unmistakably remembered that after the name of a prospective juror is placed on paper and enclosed in the capsule no way is left open to distinguish the capsule nor to know or ascertain its content, until drawn to serve as a juror, and placed on the writ of

*venire facias* requiring his attendance on the first day of the week for which he has been drawn, or if drawn from the tales box, on such day as the Court may direct. Section 610, Code 1942.

Argument of counsel cannot be taken as proof of unlawful conduct in this case. By way of illustration it is a matter of judicial public knowledge that the Federal Courts of this State are conducted by jurists and officials of unimpeachable character and that the juries in the Federal Courts by law are composed of registered electors only and do not always have a Negro member and do not have any greater proportion of Negro members. The record in this case shows that for the year 1943 there were two Negro men on the grand jury for Charleston County, and that they served with satisfaction (see page 13 of Case and Exceptions as typed).

They also served on the petit jury in 1944 and one served on the petit jury for the preceeding week of Court prior to the trial of this case in 1945 and they have served on the jury almost every year for the last 10 years (see page 18 of Case and Exceptions as typed).

There is no proof of discrimination for the registration books to be marked with the letter "c" to indicate that they were colored people. *State v. Sanders,* 103 S. C., 216, 88 S. E., 10. It is proper for the jury commissioners to become personally acquainted with the fact as to who are members of the Negro race and a failure to do so would lead to discrimination. *Smith v. Texas,* 311 U. S., 128, 61 S. Ct., 164, 85 L. Ed., 84. This principle is thoroughly discussed in the last decision of the United States Supreme Court of *Akins v. Texas,* decided June 4, 1945, and reported 325 U. S., 398, 65 S. Ct., 1276, 1280, 89 L. Ed., ——. That case holds that the history and record of the case gives evidence that the Courts of Texas endeavored to comply with the Federal Constitution in the selection of

the grand jury, and complied with the Federal decisions; the Texas Court reversed a previous conviction of the defendant on the authority of the Federal decisions and the Judge instructed the three jury commissioners who selected the last grand jury list that there should be no discrimination against anyone because of his color. The jury commissioners went in person and talked to a prospective negro juror and placed him on the grand jury, which indicted the defendant. The United States Supreme Court said "we cannot say that the omission from each of the two lists of all but one of the members of a race which composed some fifteen per cent. of the population alone proved racial discrimination." The testimony of the commissioners shows that they had no intentional limitation or discrimination. The Court held that the commissioners did not deliberately and intentionally limit the number of Negroes on the grand jury list; and that the commissioners did not violate their oath of office. The regular statutory practice for the selection of jurors was followed in that case. Fairness in the selection does not require proportionate representation of race upon a jury. There was no purposeful discrimination and mere inequality in the number selected does not show discrimination on racial grounds. "A purpose to discriminate must be present which may be proved by systematic exclusion of eligible jury men of the prescribed race or by unequal application of the law to such an extent as to show intentional discrimination" but there were no such grounds in that case and the conviction by the State Court was sustained.

We think that the factual showing in the present case is stronger in support of the ruling of the Presiding Judge when he denied defendant's motion that appears in the case of *Akins v. Texas, supra,* and the principles stated and applied in that case fully support and sustain the trial Judge's ruling in this case. We deem it unnecessary to further discuss the decisions of this State or of the Federal Court for

the reason that we think the cases already referred to are ample and conclusive. Also we have recently had occasion to review a good many of the Federal decisions on Circuit and in this Court as is presented in the case of the *State v. Grant,* 199 S. C., 412, 19 S. E. (2d), 638, *certiorari* denied 316 U. S., 662, 62 S. Ct., 942, 86 L. Ed., 1739. The foregoing disposes of any and all exceptions involving any claim and right by the defendant under the Federal Constitution and are decided adversely to the defendant.

The next question involves the refusal of the Judge ■ to exclude the juror, George Swain, on the ground that he was not disinterested. This juror was examined on his *voir dire* at the request of the State. The juror stated that he had heard the matter discussed by different people and had read about it but that he had no bias or interest. The Court correctly ruled that the juror was qualified and that his statement showed that he had not formed or expressed any opinion and that he could give the State and the defendant a fair and impartial trial. The appellant's argument states than one juror, George Swain, operator of the rathskeller at the corner of the Court House Square and Broad Street, admitted that he read about the case and heard it discussed by Court attaches and others and that the talk was one-sided. While the Case does not show any reference to the juror's employment we see no reason why his employment should in any way give rise to any interest or bias on his part. He manifestly was not employed in any capacity which would render him disqualified. The juror was peremptorily challenged by the defendant who used all ten challenges. We think that this exception cannot be sustained. *State v. McDonald,* 184 S. C., 290, 192 S. E., 365 and cases cited fully discussed the law on this subject. When a juror is sworn on his *voir dire* and states that he will be guided by the testimony and will follow the law it was within the discretion of the trial Judge that such jurors

should be presented. The manner and bearing of the juror, nature's stamp of character on form and countenance are evidential exhibits for the Circuit Judge which may indicate the juror's real attitude more than his words. *State v. Woods,* 189 S. C., 281, at pages 308 and 309, 1 S. E. (2d), 190, and cases cited.

The next exception charges that the Judge erred in charging the jury "that where a person is convicted of aggravated assault and battery of a high and aggravated nature the punishment is by fine or imprisonment or both in the discretion of the Court. The statute does not fix the limit of punishment of this offense but by analogy of other offenses the maximum would not exceed 10 years in prison." The ground for this exception is that the Court led the jury to believe that if the defendant was found guilty under the second count he would be sentenced to 10 years; whereas the Court had already read the statute for assault with intent to ravish which fixed the punishment at death except where the jury recommends to mercy where the sentence is from five years to 40 years. The appellant contends that the jury was misled and caused them to bring in the verdict as rendered for the purpose of giving the defendant a lighter sentence, as he did get the benefit of five years to 40 years. We see no error here. The judge carefully charged the law in regard to the first count which was the greater offense. He made it plain that a verdict of guilty with recommendation to mercy would warrant a sentence of not less than five years or more than 40. Any intelligent jury would certainly understand that the verdict in response to this would result in imposing a sentence within the limit of the maximum and the minimum. When the Judge charged the law in regard to the lesser offense and stated that the maximum would not exceed 10 years, he made this clear. He also told the jury that these two counts are alternative counts, that is the State could not seek conviction on both.

He also made clear to the jury that the person convicted of the lesser offense could be punished by fine or imprisonment or both in the discretion of the Court but the maximum would not exceed 10 years. The jury certainly could understand this plain language and if they wanted the defendant to be subject to a fine or felt that he was not guilty of the greater offense their verdict would have certainly expressed their purpose. The jury could not have been misled in any way. This exception cannot be sustained. It was no error of law to tell the jury what sentence could be imposed, nor was it error of the law to charge "that the statute does not fix the limit of punishment for the offense but by analogy of other offenses the maximum would not exceed 10 years." *State v. Charles,* 107 S. C., 418, 93 S. E., 136. *State v. Edwards,* 127 S. C., 116, 120 S. E., 490.

The last exception is that the verdict is contrary to the evidence and that the alibi of the defendant was established beyond a reasonable doubt. In addition to the positive identifying by the prosecutrix of the defendant there is ample corroborative testimony. The scene of the assault was visited immediately by Hartley and his wife who saw a man's tracks running off from the place and the ground torn up. She was excited when first seen. The identity of the defendant was clearly established. Mrs. Price saw him three times and had every reason to recognize him after his arrest. Her description of his clothing did not differ materially from that of other witnesses nor from his dress when he was arrested. Before the assault she saw him leave her house and go toward the Townsend yard where he was seen and spoken to by Moore and Small, two colored men who testified in the case. Her description of the defendant was that he had on tan clothes or khaki colored clothes like a soldier and tan pants. Even his grandmother when she first saw him asked "who boy that coming down the road with khaki clothes." He attempts to show that he was at his

grandmother's when the crime was committed. But the time element is not very clear. The grandmother testified that she had no clock and that he came to her house in the heat of the day at 12 or 1 o'clock and remained there about two hours. His statement as to time was that when he left his grandmother's the radio said quarter to four o'clock. He admitted that he passed the Townsend yard and saw Moore and Small who said it was 2:30 o'clock when he passed. Mrs. Price said he came to her house the first time at about 2:30 o'clock. All of the witnesses fixed the time of the outcry at about 3 o'clock, when the assault was committed. The County Police got the call between 3:15 and 3:30. His grandmother testified that he left her home going fast and that she left after him and that when she got to the Townsend place some distance away the attack had already occurred. The call was put in by Townsend for the police after the grandmother reached the Townsend place, hence, it is fair to infer from Laura Jackson's testimony, coupled with that of the police, that defendant left her house prior to quarter to four. This was a jury issue. The jury not only viewed the premises but heard the testimony in regard to the direction the defendant walked in going and coming to his grandmother's home, and after he left her home and could infer from all of the facts and circumstances that he took a route which would take him back by the Price home. The defendant admitted that he did not go to work that day at all and that he usually worked at the Navy Yard. In his testimony he admitted that he spoke of Hartley as Olin and of Hartley's sister as Maybelle, saying that he knew them both well enough to refer to them by their first names. The Negro who came to Mrs. Price's house said he had some mail for Olin and also that he had a message from Maybelle.

The investigation by the County Police Department was very careful and thorough. The arresting officers were told

that the negro boy who was seen coming through the Townsend yard by the two colored workmen was a grandson of Laura Jackson, and Townsend, who did not see the negro, thought it was Alex Gaillard, another grandson of Laura's. The officers went first to Gaillard's but came back at once and went to Middleton's house where he was questioned and arrested and brought before Mrs. Price who at once identified him. Later the officers arrested Gaillard and brought him to the jail. At the jail Mrs. Price again identified Middleton, when the officers brought him and two other strange colored men before her. The water glass was examined for finger prints by the police expert who found only one print legible enough to identify. The rest of the glass being smeared or blurred. The legible finger print was not Middleton's, but proved to be Mrs. Price's left thumb print. The testimony of the officers conclusively excluded all other parties or any other reasonable explanation except the guilt of the accused.

There is also other testimony in the record to sustain the verdict of the jury. All of the exceptions have been carefully considered and are overruled. The verdict of the jury is fully sustained by the testimony and the sentence of the Court is free from error. It is therefore, ordered that the judgment be and hereby is affirmed.

MR. CHIEF JUSTICE BAKER and MESSRS. ASSOCIATE JUSTICES STUKES, TAYLOR and OXNER concur.