16767

STATE v. WAITUS
(77 S. E. (2d) 256)

*Messrs. J. Shepherd Thompson, C. C. Grimes,* and *Meyer Rosen,* of Georgetown, *for Appellant,*

*Messrs. J. Reuben Long, Solicitor,* of Conway, and *J. Ralph Gasque,* of Marion, *for Respondent,*

July 28, 1953.

OXNER, Justice.

At the June, 1951, term of the Court of General Sessions for Georgetown County, appellant, a Negro about thirty-three years of age, was indicted for murder. Upon arraignment, he stated that he was without counsel. The Court thereupon appointed three members of the Georgetown Bar to represent him. They promptly made a motion for a change of venue which, after a full hearing, was granted and the place of trial changed to Marion County. At a special term of court in that county, held in August, 1951, the case was called for trial. Counsel for appellant made a motion for a continuance. This was refused. They then made a motion to quash the indictment upon .the ground that there had been a long-continued, systematic, and arbitrary exclusion of Negroes from grand jury service in Georgetown County where the indictment was found. Appellant also challenged the array of petit jurors in Marion County upon the same ground. It was urged that the exclusion of Negroes in each instance denied appellant the equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution of the United States. Both motions to quash were refused. The case proceeded to trial and resulted in a verdict of guilty and a sentence of death by electrocution.

There are numerous exceptions. We shall first dispose of those relating to the claim of discrimination against Negroes in the selection of the grand jury in Georgetown County and in the selection of the trial venire in Marion County. Before entering into a discussion of this question, it might not be amiss to briefly review the constitutional and statutory law of this State relating to the qualifications of jurors and the method of selecting them.

The Constitution of this State, Article 5, § 22, requires each juror to be a qualified elector between the ages of 21 and 65, and of good moral character. Article 2 prescribes the qualification of electors and provides for their registration. The term "qualified elector" means a "registered elector", and each grand and petit juror must be a registered elector. *State v. Rector,* 158 S. C. 212, 155 S. E. 385; *State v. Grant,* 199 S. C. 412, 19 S. E. (2d) 638. The constitutional requirements as to electors are set out and discussed in *State v. Middleton,* 207 S. C. 478, 36 S. E. (2d) 742. As there pointed out, every registered male elector is a potential and duly qualified juror, and his name may be taken from the registration books by the jury commissioners. The fact that he fails to vote does not make him ineligible for jury duty. (Women cannot serve on the jury in South Carolina.)

The jury commissioners of each county consist of the auditor, the treasurer and the clerk of court of such county. During December of each year, they are required to prepare from the official enrollment books of qualified electors a list of male electors of their county, between the required ages, which they deem qualified to serve as jurors. In most of the counties such list must include not less than two-thirds of the electors qualified for jury duty, but in some counties not less than one-third of such qualified electors. The jury commissioners must place the name of each person on said list on a separate paper and after folding, insert same in a container or capsule. These capsules are then placed in what is known as a "jury box". Each capsule or container placed in the jury box must be so made up as to be indistinguishable from the others. See Sections 38-51 to 38-56, inclusive, of the 1952 Code. At the same time they are also required to place a certain specified number of names in the "tales box". The names placed in this box must consist of electors residing within five miles of the court house. Section 38-60 of the 1952 Code.

The grand jury consists of eighteen men. At the end of each year six are drawn by lot to hold over for another year. The remaining twelve necessary to constitute the grand jury for the ensuing year are drawn by the jury commissioners from the jury box. Sections 38-401 to 38-405 of the 1952 Code. At a certain prescribed time before each term of court, the jury commissioners are required to draw from the jury box thirty-six petit jurors to serve for each week the court is in session. Section 38-61 of the 1952 Code. In 1953 this section was amended so as to increase this number to forty in some counties. If there is any deficiency in the required number of grand or petit jurors, such deficiency is supplied from names drawn from the tales box. Section 38-72 of the 1952 Code.

There is certainly no denial of the equal protection of the laws in any of the foregoing constitutional or statutory provisions. *Franklin v. South Carolina,* 218 U. S. 161, 30 S. Ct. 640, 54 L. Ed. 980; *State v. Middleton, supra,* 207 S. C. 478, 36 S. E. (2d) 742. Indeed, appellant does not assail the validity of any of them. His contention is that they were so administered by the jury commissioners of Georgetown and Marion Counties as to result in the arbitrary and systematic exclusion of Negroes. We now turn to the facts upon which this contention is based.

The Chairman of the Board of Registration of Georgetown County stated that there were between 5,000 and 5,200 registered electors in that county, of whom approximately 1200 were Negroes. The record shows that about four years prior to the indictment of appellant, there was a rather heavy registration of colored people. The Clerk of Court testified that she and the other jury commissioners had not discriminated against Negroes; and that she knew some were placed in the jury box but could not say how many, although she believed that the proportion of Negroes was about the same as the proportion in which they were registered. She further testified that Negroes had served as petit jurors and during the last few terms of court there had been one or more on

almost every panel of the petit jury; but that since 1947, when she assumed the office of clerk of court, she did not recall a Negro ever having served on the grand jury in Georgetown County.

We next discuss the facts upon which the motion to quash the trial venire in Marion County was based. The evidence shows that in this county there are between five and six thousand registered electors, of whom about 600 are Negroes. Two of the jury commissioners, the County Treasurer and the Auditor, estimated there were between eleven and twelve hundred names placed in the jury box, of whom between 50 and 100 were Negroes. The Auditor stated that when they made up the jury box, they checked and found that it contained the names of about 55 Negroes, and that they "went back and put some more Negroes in it." He further testified:

"Q. Do you recall whether or not any negro has been drawn at the time you were drawing a jury for either the Grand Jury or Petit Jury? A. I believe we have drawn a few negroes in some cases.

"Q. And they' were excluded from the jury? A. We considered them disqualified at the time they were drawn.

"Q. What disqualified them? A. Well, it could be several reasons that disqualified them, some had moved out of the County.

"Q. But any time a negro has been drawn, he has been disqualified? A. If we considered him disqualified.

"Q. But he has been disqualified in each case that any negro has ever been drawn—no negro has ever served? A. No, sir."

While denying that they had discriminated against Negroes in the selection of jurors, both the County Treasurer, who had held office since 1939, and the Auditor, who had held office since 1941, admitted that no Negro had ever served on either the petit or grand jury of Marion County since they assumed office. The testimony of the Clerk of Court was to the same effect.

Do the foregoing facts show unconstitutional discrimination? This question must be answered in the light of the construction which the United States Supreme Court, the final arbiter in such matters, has placed on the ·equal protection clause of the Fourteenth Amendment. We are bound by its decisions construing the Federal Constitution, although our own views may not be in accord therewith. It has been consistently held by that Court that equal protection of the laws is denied to a Negro charged with a crime whenever by any action of a State, whether through its legislature, through its courts, or through its executive or administrative officers, Negroes are intentionally excluded, solely because of their race or color, from serving upon the grand jury that indicts the defendant or the petit jury which tries him. *Carter v. State of Texas,* 177 U. S. 442, 20 S. Ct. 687, 44 L. Ed. 839; *Norris v. State of Alabama,* 294 U. S. 587, 55 S. Ct. 579, 79 L. Ed. 1074. "When a jury selection plan, whatever it is, operates in such way as always to result in the complete and long-continued exclusion of any representative at all from a large group of Negroes, or any other racial group, indictments and verdicts returned against them by juries thus selected cannot stand." *Patton v. State of Mississippi,* 332 U. S. 463, 68 S. Ct. 184, 187, 92 L. Ed. 76, 1 A. L. R. (2d) 1286.

The Fourteenth Amendment does not give a Negro charged with a crime in a state court the right to demand that the grand or petit jury, which considers his case, shall be composed, either in whole or in part, of citizens of his own race. A mixed jury is not required. "Fairness in selection has never been held to require proportional representation of races upon a jury." *Akins v. State of Texas,* 325 U. S. 398, 65 S. Ct. 1276, 1279, 89 L. Ed. 1692. "Jurymen should be selected as individuals, on the basis of individual qualifications, and not as members of a race. * * * Proportional racial limitation is therefore forbidden. An accused is entitled to have charges against him considered by a jury in the selection of which

20

there has been neither inclusion nor exclusion because of race." *Cassell v. State of Texas,* 339 U. S. 282, 70 S. Ct. 629, 631, 94 L. Ed. 839.

A Negro objecting to a grand or petit jury because of alleged discrimination against his race has the burden of proving that qualified Negroes were intentionally excluded because of their race or color. *Akins v. State of Texas, supra.* The mere absence from a particular grand or petit jury of members of the Negro race is insufficient, in and of itself, to show discrimination against the defendant in the selection of the jury. *Fay v. People of State of New York,* 332 U. S. 261, 67 S. Ct. 1613, 91 L. Ed. 2043. But where it is shown that notwithstanding the fact that a substantial proportion of those eligible for jury duty are Negroes, no Negro has been drawn for jury service over a long period of years, a strong prima facie case of racial discrimination is shown. *Norris v. State of Alabama, supra,* 294 U. S. 587, 55 S. Ct. 579, 79 L. Ed. 1074. When such a showing is made, the burden is upon the State "to justify such an exclusion as having been brought about for some reason other than racial discrimination." *Patton v. State of Mississippi, supra,* 332 U. S. 463, 68 S. Ct. 184, 186, 92 L. Ed. 1286. In a concurring opinion in *Cassell v. State of Texas, supra,* 339 U. S. 282, 70 S. Ct. 629, 634, 94 L. Ed. 839, it was stated: "If one factor is uniform in a continuing series of events that are brought to pass through human intervention, the law would have to have the blindness of indifference rather than the blindness of impartiality not to attribute the uniform factor to man's purpose. The purpose may not be of evil intent or in conscious disregard of what is conceived to be a binding duty. Prohibited conduct may result from misconception of what duty requires."

In applying the rule just stated, the Supreme Court in *Hill v. State of Texas,* 316 U. S. 400, 62 S. Ct. 1159, 86 L. Ed. 1559, found discrimination in the selection of grand jurors in Dallas County, Texas, by virtue of that fact that,

despite a large number of Negroes qualified for grand jury service, none had been drawn. A similar conclusion has been reached in other cases. *Norris v. State of Alabama, supra,* 294 U. S. 587, 55 S. Ct. 579, 584, 79 L. Ed. 1074; *Patton v. State of Mississippi, supra.* In speaking of the type of evidence necessary to rebut a prima facie showing of discrimination, the Court, in *Norris v. State of Alabama, supra,* said: "We think that this evidence failed to rebut the strong prima facie case which defendant had made. That showing as to the long-continued exclusion of negroes from jury service, and as to the many negroes qualified for that service, could not be met by mere generalities. If, in the presence of such testimony as defendant adduced, the mere general assertions by officials of their performance of duty were to be accepted as an adequate justification for the complete exclusion of negroes from jury service, the constitutional provision—adopted with special reference to their protection— would be but a vain and illusory requirement."

Applying the foregoing principles to the facts in Marion County, the conclusion is inescapable that there has been an unconstitutional discrimination and the Court should have granted appellant's motion to quash the panel of petit jurors when the case was called for trial. In this county approximately 10% of the qualified electors are Negroes. Between five and ten per cent of the names in the jury box are members of the colored race. Notwithstanding this substantial percentage of potential Negro jurors, we have the indisputable fact that for a period of at least twelve years, no Negro has ever sat on either the grand or the petit jury in Marion County. There was thus made out a strong prima facie case of racial discrimination in the selection of the jury. The only evidence to rebut this prima facie case is the general statement of the jury commissioners that there was no intentional and purposeful discrimination. This under the decisions which we have reviewed is insufficient. We are quite sure that there was no evil intent or conscious disregard of duty by the jury commissioners,

but, as stated in a concurring opinion in *Cassell v. State of Texas, supra,* 339 U. S. 282, 70 S. Ct. 629, 635, 94 L. Ed. 839, "prohibited conduct may result from misconception of what duty requires."

The situation in Georgetown County is somewhat different but the principle is the same. The complaint here is that there was discrimination in the selection of the grand jury. Almost 25% of the qualified electors are Negroes but there is no evidence as to the number placed in the jury box. It was the opinion of the Clerk of Court that the proportion was substantially the same as that in which they were registered. If she was correct in this belief, about 25% of the names in the jury box were Negroes. From 1947 to 1951, when appellant was indicted, it appears that no Negro was ever drawn on the grand jury. Under any view of this matter, it would seem that chance and accident alone could hardly have brought about the total absence of Negroes on the grand jury. It does appear that they have served as petit jurors. In view of the fact that considerably more petit jurors are drawn than grand jurors, it would be natural to expect the total number of Negroes serving as petit jurors to exceed those serving as grand jurors. But the fact remains that twelve new grand jurors were drawn each year and there is no satisfactory explanation of the total absence of Negroes. The motion to quash the indictment should have been granted. What we have said as to the good faith and intentions of the jury commissioners of Marion County also applies to those of Georgetown County.

It has been suggested that discrimination in the selection of the grand jury, illegal though it be, results in no prejudice to a defendant whom a trial jury has convicted. The theory advanced is that the States are not required to use a grand jury at all; that its power is only to accuse, not to convict; and that any indictment rendered by the grand jury merely puts the accused to trial. See the dissenting opinion of Mr. Justice Jackson in *Cassell v. State of Texas, supra,* 339 U. S.

282, 70 S. Ct. 629, 94 L. Ed. 839. But the majority of the United States Supreme Court has not taken that view.

The facts of the instant case are distinguishable from those in *State v. Grant, supra,* 199 S. C. 412, 19 S. E. (2d) 638; and *State v. Middleton, supra,* 207 S. C. 478, 36 S. E. (2d) 742. In each of these cases we held that there was a failure to establish discrimination on account of race, although the defendant was indicted and convicted by an all-white jury. In the *Grant case,* there was only one registered Negro elector. In the *Middleton case,* although the percentage of Negro registered electors was only four or five per cent, members of this race were rather consistently drawn and served both as grand and petit jurors in Charleston County.

In concluding our discussion of this phase of the case, we desire to quote the following timely observation of the Supreme Court of our sister state of Georgia in *Crumb v. State,* 205 Ga. 547, 54 S. E. (2d) 639, 641, with reference to the decisions of the United States Supreme Court on the question of racial discrimination in the selection of juries:

"And whatever may be the individual opinion of the members of this court as to the correctness, soundness, or wisdom of these decisions, it becomes our duty to yield thereto, just as the other courts of this State must accept and be controlled by the decisions and mandates of this court. This being a government by law and not by men, the jury commissioners in their official conduct are bound by the foregoing rulings of the Supreme Court of the United States, notwithstanding any personal opinion, hereditary instinct, natural impulse, or geographical tradition to the contrary."

Our conclusion that the Court below erred in refusing to quash the indictment and to quash the panel of petit jurors does not mean that appellant goes free. He is still subject to indictment by a lawfully constituted grand jury, upon which he may be tried again by a jury selected without discrimination. He will not be released but held pending the action of another grand jury.

In view of the foregoing conclusions, it is not necessary to the disposition of this appeal to pass upon the other exceptions. However, since on another trial several of these questions will likely arise again, we think it proper that they be settled now. Among these is the contention that the Court below erred in admitting an alleged confession made by appellant. In determining whether it was invalid as a matter of law and should have been excluded, it is necessary to briefly review a few of the circumstances surrounding the homicide and the events leading up to the purported confession.

On the night of April 30, 1951, a young white woman was brutally murdered in the town of Georgetown. There were no eye-witnesses. It may be reasonably inferred from the testimony that she was assaulted shortly after nine o'clock while returning home from the picture show. Her husband was then at work. He arrived home about 10:45. After waiting for some time, he went to see several of his wife's relatives in an effort to find her. She was not at any of these places. He became alarmed and the officers were notified. An extended investigation followed. Finally, about 3:00 A. M., or about six hours after the alleged homicide, the body of the deceased was found in the furnace room of the parish house of Prince George Winyah Church, which is about three or four hundred feet from her home. Her head was covered with a newspaper. There was considerable dirt on the body. Her hair was disheveled and clothes disarranged. Some articles of clothing were missing. An examination revealed numerous scratches, abrasions and blood spots. There was also a large bruised area on the right side of the neck. Medical evidence was to the effect that death resulted from strangulation. The theory of the State was that the motive of the assailant was rape, but apparently from the evidence this purpose was not accomplished.

After the body was found, a search was made of the adjacent area. Fresh tracks of a man and woman were observed in a nearby vacant lot. A stocking belonging to the deceased

was found in the adjoining cemetery. There was blood on one of the tombstones. The appearance indicated that a body had been dragged in the cemetery and over the wall. Sometime later the watch of the deceased was found near the wall of the cemetery and some of her clothes in a sawdust pile several blocks away.

An extensive investigation was made by the officers. Finally, on May 8, 1951, a warrant was issued for appellant. He was arrested on May 10th at Fairmount, North Carolina, and brought to the penitentiary at Columbia. On at least four or five occasions he was taken from the penitentiary to the offices of the State Constabulary, located five or six miles from Columbia, where he was interrogated. Most of the questioning was done by the Sheriff. We take the following from the testimony of the officers:

At first appellant denied any knowledge of the crime. About a week later, while still asserting his innocence, he said that deceased was killed by Charles Blunt, a Negro who lived at Georgetown, and that he was with Blunt at the time. Blunt was then brought from Georgetown to the headquarters of the State Constabulary, where he was questioned separately and along with appellant. He denied any connection with the crime but appellant continued to accuse him. Blunt was then placed in the penitentiary. Finally, on May 19th the Sheriff received information that appellant wanted to see him. He arrived at the offices of the State Constabulary on the afternoon of May 21, 1951, where he and several other officers interrogated appellant for about an hour. Appellant then indicated a desire to see the Sheriff alone. This was arranged and he stated to the Sheriff that he and not Blunt had committed the crime. According to the Sheriff, after appellant confessed, he was asked what became of the watch of the deceased and the clothes which were missing, to which appellant replied that the watch was dropped near a wire fence and some of the clothing had been buried in a sawdust pile about 150 feet from his home. The Sheriff then got in touch by telephone with one of his deputies, who tes-

tified that a few hours later he found the clothes in the saw-dust pile and the next morning after considerable raking, located the watch near the wire fence.

Shortly after the examination of appellant was completed, the officers undertook to get in touch with the stenographer employed at the offices of the State Constabulary for the purpose of having the confession reduced to writing. She was away from home and could not be located until around midnight, at which time the confession was typed and executed.

The details of this confession need not be related. It is sufficient to say that appellant, who lived several blocks from the scene of the crime, said that he assaulted the deceased with the intention of having sexual relations with her and during the course of such assault killed her accidentally.

The Sheriff and other officers testified positively that appellant was not at any time intimidated, abused or threatened; that his statements were freely and voluntarily given; that there was no protracted questioning; that appellant was only taken to the offices of the State Constabulary four or five times; that he was offered but refused counsel; and that he was repeatedly told that any statement made by him might be used against him.

Appellant denied the foregoing testimony by the State relating to the confession. He said that after being arrested, he was "treated all right for two or three days," after which time the officers began getting "tough"; and that finally on May 21st, he was brought to the office of the State Constabulary about eight o'clock in the morning where he was questioned continuously without food until four or five o'clock the next morning, at which time he signed the purported confession on account of threats made against him. He said that about three o'clock on the afternoon of May 21st, he got into a fight with Blunt by whom he was badly beaten in the sight of the officers, who made no attempt to rescue him; and that about two or three o'clock on the morning of May 22nd, about an hour before he signed the confession.

he was beaten with a strap by the officers and hit on the head with a blackjack. He contended that he was given no food until after he signed the confession.

It is readily seen that the evidence is in sharp conflict as to the voluntariness of the alleged confession. Under the rule which prevails in this State, the question of whether or not the confession is voluntary is one which is addressed to the Court in the first instance, but if the evidence with respect thereto is conflicting, the jury must be the final arbiter of such fact. Under the circumstances of this case, we think the trial Judge properly submitted this issue to the jury. *State v. Miller,* 211 S. C. 306, 45 S. E. (2d) 23; *State v. Brown,* 212 S. C. 237, 47 S. E. (2d) 521. The facts here are readily distinguishable from those in *State v. Harris,* 212 S. C. 124, 46 S. E. (2d) 682, where a majority of this Court held that the issue of the voluntariness of the confession was properly submitted to the jury, but the United States Supreme Court reversed. 338 U. S. 68, 69 S. Ct. 1354, 93 L. Ed. 1815. Neither can it be said that the circumstances under which this confession was received violate those fundamental principles of liberty and justice which are protected by the Fourteenth Amendment against infraction by any State. *Gallegos v. State of Nabraska,* 342 U. S. 55, 72 S. Ct. 141, 96 L. Ed. 86.

Error is assigned in the admission of four pictures of deceased taken in the boiler room of the parish house before the body was removed. It is claimed by the State that these pictures were relevant as showing the marks, bruises and abrasions made as a result of the assault, the condition of the clothes of deceased, and that her rings had been removed and placed on the index finger. There was no dispute as to these facts. All of them were fully established both by uncontradicted medical and lay testimony. These pictures were calculated to inflame and arouse the passions of the jury and their introduction was wholly unnecessary to establish the facts claimed. They should have been excluded. The rule

governing this question is discussed in *State v. Edwards,* 194 S. C. 410, 10 S. E. (2d) 587.

Another exception is to the effect that the trial Judge erred in refusing to submit to the jury the issue of .manslaughter. Appellant denied any connection with the crime and introduced considerable testimony tending to establish an alibi. A careful examination of the testimony fails to suggest any theory upon which a verdict of manslaughter could rest. This exception is overruled.

We shall not undertake to pass upon the remaining exceptions. One relates to an exhibit which is not incorporated in the record before us. Several are not referred to in appellant's brief and presumably have been abandoned. There are others that relate to matters that will probably not arise on another trial.

In concluding this opinion, we desire to recognize the conscientious and able manner in which counsel for appellant, who served without compensation, have discharged their duties. The arduous task imposed upon them has been skilfully handled.

Judgment reversed and case remanded for further proceedings in accordance with this opinion.

BAKER, C. J., and FISHBURNE, STUKES and TAYLOR, JJ., concur.